No. 23-11280-D

# United States Court of Appeals for the Eleventh Circuit

**Samuel Scott Jr.,**

Appellant/Plaintiff

-versus-

**City of Miami, et al.**

Appellees/Defendants

**APPELLANT'S BRIEF**

**FAUDLIN PIERRE**

PIERRE **SIMON**

Counsel for Appellant/Plaintiff

Florida Bar No. 56770

600 SW 4th Avenue

Fort Lauderdale, Florida 33315

Phone:     (305) 336-9193

Email:     fplaw08@yahoo.com

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to 11th Circuit Rule 26.1-1, Appellee furnishes the following complete list of parties with an interest in the outcome of this appeal:

1. Samuel Scott Jr, Plaintiff-Appellant.

2. Faudlin Pierre, Attorney for Appellant.

3. Jennito Simon, Attorney for Appellant.

4. Pierre Simon, LLC, the law firm representing the Appellant.

5. City of Miami, Defendant – Appellee.

6. Jonathan Guzman, Defendant – Appellee.

7. Miguel Hernandez, Defendant – Appellee.

8. Randy Carriel, Defendant – Appellee.

9. Michael Bloom, Defendant – Appellee.

10. Brandon Fernandez, Attorney for City of Miami, Guzman, Carriel, and Bloom.

11. Lourdes Wydler, Attorney for Hernandez.

12. Hon. Paul Huck.

13. Hon. Jacqueline Becerra.

_____

Faudlin Pierre, Attorney at Law

## **STATEMENT REGARDING ORAL ARGUMENT**

Scott respectfully requests oral argument in this case to afford the Court the opportunity to pose any questions it may have concerning the facts or the parties' respective positions on appeal, as well as to address any new issues presented in the reply brief that require clarification and further argument. Scott believes that participation in oral argument will be beneficial, and that the decisional process will be significantly aided by this Court's grant of oral argument.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS .......................................................i

STATEMENT REGARDING ORAL ARGUMENT ........................................... ii

TABLE OF CONTENTS ....................................................................... iii

TABLE OF CITATIONS .........................................................................iv

STATEMENT OF JURISDICTION .................................................... vii

STATEMENT OF ISSUES ......................................................................1

INTRODUCTION ....................................................................................2

STATEMENT OF THE CASE ................................................................4

SUMMARY OF THE ARGUMENT ......................................................17

ARGUMENT .........................................................................................19

   I.   The district court erred granting summary judgment on Scott's federal claims. ...............................................................................................19

      Federal Claims......................................................................................20

      Seizure ...................................................................................................21

      Search ....................................................................................................26

      Clearly Established................................................................................29

   II.   The district court erred granting summary judgment on Scott's state claims. 31

      Sovereign Immunity .............................................................................31

      False Arrest...........................................................................................35

      Malicious Prosecution ........................................................................35

   III.     Qualified immunity is unconstitutional. ...............................38

CONCLUSION ......................................................................................40

CERTIFICATION..................................................................................41

CERTIFICATE OF COMPLIANCE .....................................................41

## **TABLE OF CITATIONS**

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...........................19

*Baxter v. Bracey*, 140 S. Ct. 1862 (2020)...................................39

*Bell v. Neukirch*, 979 F. 3d 594 (8th Cir. 2020) .........................23

*Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020)...........................40

*Buchanan v. Miami Herald Publ'g Co.*, 230 So. 2d 9 (Fla. 1969).........36

*Burns v. GCC Beverages, Inc.*, 502 So. 2d 1217 (Fla. 1986)..............36

*Burton v. City of Belle Glade*, 178 F. 3d 1175 (11th Cir. 1999) ............19

*Butler v. Gualtieri*, 41 F. 4th 1329 (11th Cir. 2022) .........................31, 34

*Carter v. Butts Cnty., Ga.*, 821 F. 3d 1310 (11th Cir. 2016)..................29

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) .........38

*Gold v. City of Miami*, 121 F. 3d 1442 (11th Cir. 1999).....................35

*Goodson v. City of Corpus Christi*, 202 F. 3d 730 (5th Cir. 2000).........23

*Harris v. Lewis State Bank*, 482 So. 2d 1378 (Fla. 1st DCA 1986).......37

*Hope v. Pelzer*, 536 U. S. 730 (2002).......................................21

*Ill. v. Rodriguez*, 497 U.S. 177 (1990) .....................................26

*Imaging Bus. Machs., LLC v. BancTec, Inc.*, 459 F. 3d 1186 (11th Cir. 2006)......33

*Lee v. Ferraro*, 284 F. 3d 1188 (11th Cir. 2002) ...........................20, 29

*Lemay v. Kondrk*, 923 So. 2d 1188 (Fla. 5th DCA 2006) ....................32

*Maryland v. Pringle*, 540 U.S. 366 (2003)...................................21

*Mathis v. Coats*, 24 So. 3d 1284 (Fla. 2d DCA 2010) ......................35

*McCabe v. Sharrett*, 12 F.3d 1558 (11th Cir. 1994) ........................19

*McCoy v. Webster*, 47 F. 3d 404 (11th Cir. 1995) ..........................20

*McGhee v. Volusia Cty.*, 679 So. 2d 729 (Fla. 1996)........................32

*Mercado v. City of Orlando*, 407 F. 3d 1152 (11th Cir. 2005) .............21

*Miami-Dade County v. Asad*, 78 So. 3d 660 (Fla. 3d DCA 2012).........35

*Mincey v. Arizona*, 437 U.S. 385 (1978) ...............................................27

*New Prime Inc. v. Oliveira*, 139 S. Ct. 532 (2019) ..................................40

*Orr v. Belk Lindsey Stores, Inc.*, 462 So. 2d 112 (Fla. 5th DCA 1985) .................36

*Peterson v. Pollack*, 290 So. 3d 102  (Fla. 4th DCA 2020) ...................32

*Rankin v. Evans*, 133 F. 3d 1425 (11th Cir. 1998) ......................21, 22, 35

*Reza v. State*, 163 So. 3d 572 (Fla. 3d DCA 2015) ..................................22

*Rogers v. Jarrett*, 63 F.4th 971 (5th Cir. 2023) .......................................39

*Saucier v. Katz*, 533 U. S. 194 (2001) ...................................................21

*Sibron v. New York*, 392 U.S. 40 (1968) ...............................................27

*State v. Maynard*, 783 So. 2d 226 (Fla. 2001) .........................................24

*Strother v. Lucas*, 37 U.S. 410 (1838) ...................................................38

*Terrell v. Smith*, 668 F. 3d 1244 (11th Cir. 2012) ...................................22

*Terry v. Ohio*, 392 U.S. 1 (1968) .........................................21, 27, 28, 30

*Tolan v. Cotton*, 134 S. Ct. 1861 (2014) ................................................20

*Torres v. Madrid*, 141 S. Ct. 989 (2021) ...............................................21

*Tower v. Glover*, 467 U.S. 914 (1984) ...................................................40

*United States v. Banshee*, 91 F. 3d 99 (11th Cir. 1996) ..........................27

*United States v. Clay*, 483 F. 3d 739 (11th Cir. 2007) ............................28

*United States v. Jacobsen*, 466 U.S. 109 (1989) .....................................26

*United States v. Jones*, 619 F.2d 494 (5th Cir. 1980) .............................30

*Virginia v. Moore*, 553 U.S. 164 (2008) ...............................................27

*Wheaton v. Peters*, 33 U.S. 591 (1834) .................................................38

**Statutes**

28 U.S.C. § 1291 .................................................................................vi

Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871)........................38

Fla. Stat. § 768.28 (2018) ....................................................................31

**Other Authorities**

Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev.

201 (2023).........................................................................................................39

**Rules**

Fed. R. Civ. P. 56 ......................................................................................................19

**Constitutional Provisions**

U.S. Const. amend. IV.........................................................................................21, 26

# STATEMENT OF JURISDICTION

On March 21, 2023, the district court entered an order granting summary judgment and subsequent final judgment in favor of the City of Miami and its law enforcement officers. The jurisdiction of this court is invoked under 28 U.S.C. § 1291. This court has jurisdiction to review final orders and judgments of the district courts. Scott filed a timely notice of appeal on April 15, 2023.

## <u>STATEMENT OF ISSUES</u>

1. Whether a reasonable jury could find that Appellees lacked probable cause to arrest Scott as the suspected car thief, considering that (1) Scott, who reported his vehicle stolen, did not match the thief's physical description, except for being a big Black bald male in Miami, (2) had clothing that did not match the suspected thief, and (3) within eight minutes, was located two miles away from the place where the suspect fled on foot from an officer who never saw the face of the fleeing suspect.

2. Whether the district court erred in granting summary judgment to the City on the issue of sovereign immunity, in the absence of a request for such relief by the City and without prior notice to the parties by the district court.

3. Whether the continued application of the qualified immunity doctrine should be rejected on the grounds that it infringes upon the exclusive role of the legislature and is inconsistent with legislative intent.

## **INTRODUCTION**

Samuel Scott Jr., dressed in a black shirt and blue jeans, reported the theft of his vehicle to the City of Miami and its officers. At 6:22 p.m., the dispatcher relayed information to all on-duty officers, stating that Scott's vehicle had been stolen by an unknown assailant, and provided details including Scott's name, current location, and telephone number.

Simultaneously, Officer Jonathan Guzman observed Scott's car crash approximately two miles away but did not see the suspect's face; instead, he described the suspect as a 6'2" bald, heavyset Black man wearing a white tank top. Officer Guzman never located the suspect but did encounter Scott later that day as Scott was meeting with Officer Michael Bloom, who responded to the initial stolen vehicle dispatch call. Officer Bloom met with Scott within eight minutes of the crash. When Officer Bloom initially approached Scott, he did not display any signs of suspicious behavior or appear to have just come from a run. The suspect fled on foot from the crash. And unlike the suspect, Scott was four inches shorter than the suspect's description and was wearing a black shirt, not a white tank top.

However, after conducting a frisk of Scott, the officers discovered a white tank top beneath his black shirt. The officers' rationale for arresting and searching Scott was that he matched the suspect's description. In other words, he was a big,

bald Black man in Miami—and that (along with a white undershirt) was reason enough to suspect that he was driver of the stolen vehicle located two miles away.

At the summary judgment stage, the district court found that there was no genuine material issue of fact that there was probable cause to arrest, search, and prosecute Scott. In other words, the district court found that a reasonable officer would have believed that Scott could be in two places at once because he was baldhead heavyset Black man wearing a white tank top beneath his black shirt in a predominantly Black area. The district court also rested its ruling on Officer Guzman's post-litigation statements that he saw the suspect's face after the crash, a fact that was contradicted by his contemporaneous police report, only the latter of which must be credited under prevailing summary judgment standards. The district court erred. A reasonable jury could believe that the officers lacked probable cause to arrest Scott under the totality of circumstances. And a jury could disbelieve Officer Guzman's belated claims of seeing the suspect's face. Under clearly established law, the officers are not entitled to any reprieve for their unconstitutional conduct. Accordingly, this Court should reverse the district court's rulings.

## <u>STATEMENT OF THE CASE</u>

On June 1, 2018, Samuel Scott Jr., visited his relative in Miami, Florida. ECF No. 56-1, 138:6-22. The overwhelming majority of the residents in this area are Black. ECF No. 69-3, 90:22-91:1. Scott, a 42-year-old Black male who stands at 5'10" tall, was dressed in a black t-shirt and blue jeans. ECF No. 56-1, 137:2-10, 69-2, 1.

Scott parked his 2006 black Jeep Compass in front of his relative's house. ECF No. 56-1, 139:2-5. The car's windows were tinted, and the windshield had dark tints around its edges. ECF No. 69-1, ¶¶ 4, 8. Scott's work ID was hanging from a lanyard on the rearview mirror. *Id*. at ¶¶ 3, 7.

Scott went into his relative's home for a few minutes, and when he exited, his vehicle was gone. ECF No. 56-1, 139:13-140:8.

Approximately two miles from where Scott's vehicle was stolen, City of Miami police officer Jonathan Guzman was conducting a radar detail. ECF No. 69-2, 1. While on his radar detail, Officer Guzman saw a 2006 Jeep Compass pass him while traveling 50 miles per hour in a 30 miles per hour zone. ECF No. 69- 2, 1-2. He could not see who was in the vehicle. ECF No. 69-2, 1-2, 69-3, 34:2-5, 166:1-2, 8-9, 244:10-12, 14, 17-19, 22.

Officer Guzman began to follow the Jeep Compass after the vehicle passed him. ECF No. 69- 2, 1.

Scott reported his vehicle stolen to the City of Miami police dispatcher. ECF

No. 56-1, 52:25-53:1. At 6:22 p.m., the dispatcher reported to all City of Miami

police officers that Scott's vehicle was stolen by an unknown assailant and that the

vehicle was last seen on 48th Street and 6th Avenue. ECF No. 69-10. The dispatcher

identified the caller as "Samual" and provided Scott's number and his location. *Id.*

At the same time Guzman received the dispatch, two miles away from where

Scott was located, Guzman witnessed the Jeep Compass crash into a parked car. ECF

No. 69-4, 1, 69-10. The suspect exited the vehicle and fled. ECF No. 69-2, 2.



Guzman did not see the driver's face, only the driver's back. ECF No. 69-3, 166:1-2, 8-9. He observed the driver running northbound under the I-95 tunnel, 20 yards ahead of him in the opposite direction of Scott's location. ECF No. 69-2, 2, 69-3: 36:1-11, 17-22. In his arrest affidavit, Guzman described the driver as a "black male, bald [sic], about 62, heavy set, with a white tank top". ECF No. 69-2, 2. Guzman's description is silent on the suspect's facial features (e.g., beard). *Id*.

Guzman then searched Scott's stolen Jeep Compass. ECF No. 69-2, 2. He saw Scott's work ID hanging on the rearview mirror, which was the first time he had seen Scott's face. ECF No. 69-2, 2, 69-3, 91:11-13, 16. Guzman did not radio for officers to arrest Scott as the person matching the suspect he witnessed flee on foot. ECF No. 69-2.

Minutes later, Officer Michael Bloom responded to the original dispatch call of a stolen vehicle. ECF No. 69-10. Bloom called Scott with the number provided to him in the dispatch. ECF No. 56-1, 53:2-6. When Scott saw Bloom, he waved Bloom down. *Id*. At 6:30 p.m., Bloom met Scott in front of his relative's house. *Id*. Scott was wearing a black shirt and blue jeans. ECF No. 56-1, 137:4-6. According to Bloom, Scott did not appear to have come from a run and stated it would be odd for a person to run in jeans. ECF No. 69-8, 254:8-9, 12-17. Scott did not change his clothes while in Bloom's presence. ECF No. 69-8, 34:2-4. Bloom testified that when

he made contact with Scott, he did not suspect Scott of criminal activity and there was nothing suspicious about Scott's behavior. ECF No. 69-8, 46:11-22; 64:1-4.

Bloom questioned Scott about his stolen vehicle. ECF No. 56-1, 53:2-11. Bloom asked Scott to complete and execute a stolen vehicle affidavit detailing the situation. ECF No. 56-1, 80:16-18. Scott completed the affidavit as instructed. ECF No. 56-1, 53:13-14.

Back at the crash scene, Officer Randy Carriel arrived and met Guzman. ECF No. 69-6, 34:13-17, 34:24-25:1. Guzman told Carriel the description of the fleeing suspect was a Black male, heavyset, white tank top with *shorts*. ECF No. 69-6, 41:18-25, 42:2. Guzman did not disclose to Carriel whether the suspect was bald. *Id*.

Officer Brandon Williams arrived at the crash scene, and Guzman asked him to complete the crash report. ECF No. 69-5, 6:2-8. Guzman told Williams everything he knew about the crash. *Id*. Again, despite having Scott's photograph and name in hand, Guzman did not identify Scott as the suspect to Williams. ECF No. 69-5, 6:16-19, 24.

Guzman and Carriel then joined Bloom at Scott's location. ECF No. 69-8, 57:14-24. Prior to their arrival, Bloom did not speak to Guzman or Carriel. ECF No. 69-8, 57:14-61:12. In fact, Bloom did not know Carriel or Guzman until their arrival. *Id*. Bloom did not communicate Scott's physical description to anyone. ECF No. 69-

8, 79:4-6. Officer Miguel Hernandez arrived on the scene as the backup unit. ECF No. 69-9, 28:6-13.

When Guzman and Carriel arrived, they observed Scott wearing a black shirt (not a white tank top) with blue jeans (not shorts). ECF No. 50, Guzman BWC 1, T22:45:35Z.

Guzman then spoke to Bloom. ECF No. 50, Guzman BWC 1, T22:45:54Z - T22:46:00Z. Guzman asked Bloom whether Scott completed the stolen vehicle affidavit. *Id*. Bloom replied he did. *Id*.

Addressing Bloom, Carriel uttered, "That the bailout". ECF No. 50, Guzman BWC 1, T22:45:50Z - T22:45:54Z.

After Guzman spoke with Bloom, Guzman walked over to his car, picked up his cell phone and calls his sergeant, and stated: "Sarge, that's your boy . . . he signed the affidavit already." ECF No. 50, Guzman BWC 1, T22:46:02Z - T22:46:53Z. Guzman made this statement even though he had never seen the driver's face and the suspect's physical appearance differed from Scott's. ECF No. 56-1, 137:4-6, 69-2,1-2, 69-3, 166:1-2, 8-9.

Scott did not pose a danger to any of the police officers. ECF No. 50, Guzman BWC 1, Guzman BWC 2, Guzman BWC 3, Carriel BWC, 69-8, 81:6-83:12. In fact, Bloom and Hernandez described Scott as polite. ECF No. 69-8, 82:18-21, 69-9, 145:5-9.

Hernandez, Bloom, and Carriel surrounded Scott. ECF No. 69-6, 87:10-14. Carriel had his taser out ready to use it on Scott. ECF No. 69-6, 57:16-17, 56-1, 86:10-12. Hernandez directed Scott to empty his pockets and place his hands on Bloom's patrol car. ECF No. 50, Carriel BWC T22:47:14Z - T22:47:47Z, 56-1, 86:24-87:9; 89:8-19. Hernandez then searched Scott, including his wallet. ECF No. 50, Carriel BWC T22:47:14Z - T22:49:01Z. His initial search did not reveal any weapons. *Id*. Hernandez's conducted a subsequent search which revealed that Scott was wearing a white tank top beneath his black shirt. ECF No. 50, Carriel BWC, T22:50:08Z - T22:50:22Z.

As Hernandez was attempting to handcuff Scott, Guzman walked over to Hernandez and stated "QRX. QRX. QRX. QRX. QRX. QRX. He's being detained right now but QRX."[1] ECF No. 50, Guzman BWC 1, T22:47:03Z - T22:47:33Z. In response, Carriel exclaimed "detain him, detain him." *Id*.

Growing impatient, Carriel said to Guzman: "Papi tiene la camiseta blanca debajo. Tiene la camiseta blanca debajo. Con es no mas. Eso no mas." ECF No. 50, Carriel BWC T22:47:50Z - T22:47:59Z. Carriel said that his statement translated to English meant they had probable cause to arrest Scott because he had the white shirt underneath and they didn't need anything more. ECF. No. 69-6, 170:1-13.

---

[1] QRX means "standby" in police code. ECF No. 69-6, 80:2-8.

Carriel asked Scott why he was sweating. ECF No. 50, Carriel BWC T22:50:46Z - T22:51:08Z. Scott explained that he was on testosterone. *Id*. Bloom testified that Scott was a big guy who had minimal sweat on his forehead while outside in Miami. ECF No. 69-8, 32:17-20.

Carriel expressed his frustration that the arrest was taking too long and explained to the officers in Spanish, "We are wasting time. We are losing." ECF No. 50, Carriel BWC T22:49:37Z - T22:50:27Z, 69-9, 108:18-21.

Carriel then said to Guzman, "Papi pero si tu lo puedes ver y es el, no hay que esperar a nada." ECF No. 50, Carriel BWC T22:51:09Z - T22:51:17Z. Carriel testified that his statement to Guzman translated to English as: "If this is the guy you saw, we don't have to wait for anything else." ECF No. 69-6, 173:13-14. Hernandez stated that Carriel's statement translated to English as: "If you saw him and identified him, what are you waiting for?" ECF No. 69-9, 110:11-17. Carriel conceded that the implication of his statement was that if Guzman saw this guy, there was enough probable cause to arrest him. ECF No. 69-6, Carriel Depo. 174:6-12. But, again, there were no contemporaneous statements by Guzman at the scene or in his arrest report that he saw the face of the fleeing suspect. ECF No. 50, Guzman BWC 1, Guzman BWC 2, Guzman BWC 3, Carriel BWC, 69-2.

Other contemporaneous evidence corroborated that Guzman had not seen the

fleeing suspect's face. After the events described immediately above, Guzman then

called his sergeant and told him the following:

> Yeah that's him. Sarge, he's sweating. He has a black shirt on top of
> the tank top shirt that he had when he was driving. …. No, no he wasn't.
> Eh, no no. They didn't tell me they saw the guy. The guy was on the
> phone. The short guy was on the phone when I got there. I don't know
> if he saw the guy or not. That's when I came back. There was nobody
> outside when he crashed.

ECF No. 50, Guzman BWC 1, T22:51:25Z - T22:52:08Z. Guzman did not relay to

his sergeant that he saw the fleeing suspect's face. *Id*.

After speaking with his sergeant, Guzman instructed Scott to put his hands

behind his back and proceeded to handcuff Scott. ECF No. 50, Guzman BWC 1,

T22:52:36Z - T22:53:05Z. Scott asked if he was being arrested, and Guzman said

that he was being detained. *Id*. Scott asked why he was being detained. Guzman said

that once they got Scott's story straight, he would explain why Scott was being

detained in a minute. ECF No. 50, Guzman BWC 1, T22:53:48Z - T22:54:07Z. Scott

expressed disbelief that his actions could have led to his arrest, to which Guzman

responded dismissively, stating that he doesn't care. *Id*.

Carriel clapped his hands in congratulations when Scott was finally

handcuffed and escorted to the patrol car. ECF No. 50, Carriel BWC, T22:54:09Z -

T22:54:18Z.

11

Guzman then placed Scott in Hernandez's vehicle, which had its windows up.

ECF No. 50, Guzman BWC 1, T22:54:17Z - T22:55:177Z. Scott began to sweat

profusely due to the high temperature inside the car, a fact Guzman acknowledged.

ECF No. 50, Guzman BWC 2, T22:59:31Z – T23:01:09Z.

While explaining the reason for the detention, Guzman told Scott, "The

description of the car and the person who fled in it matches yours." ECF No. 50,

Guzman BWC 2, T22:59:56Z – T23:00:00Z.

In response, Scott told Guzman:

> I'm telling you, you guys got the wrong guy. I can confirm where
> I was and I can confirm my activities. I recently logged off the VPN at
> my job. Roughly before I came over here before I called you guys. But
> I'm telling you, you guys got the wrong guy…But that's half of Miami.
> Baldheaded with a beard. Even if he had dreads, it dreads with a beard.
> But then that's it's not fair I mean, like I said, my kids, I called because
> my car got stolen, and my kids are over there. They don't even know
> what's going on…I told you probably about my five. I didn't pay
> attention to the time. I really…Just jumped out of the car to go see.
> That's it. If you want. Like I said, we can go. Like I had my kids. And
> stuff like that. Dropped them off, came over to say hi, and I went, I
> mean I don't know what happened. I don't know. I mean, like I said, I
> know the people that stay across there, over here, all over the place. I
> don't know what happened. My car just somebody jumped in drove off.
> And I'm sorry, but I tell you, I didn't do it. I mean, I. literally. I mean,
> why would I call the police? I mean, I called because my car is stolen.
> I mean, how me and my kids are going to get home? My pillow, my
> work Id, my work stuff. All of that stuff is in there. Why would I? That's
> why I'm like, what? What's why am I in handcuffs if I am calling them?

ECF No. 50, Guzman BWC 2, T22:59:38Z – T23:01:04Z.

Scott was taken to a police station initially, and later he was transferred to jail. ECF No. 69-2, 2. He remained in custody until he was finally released at midnight the next evening. ECF No. 56-1, 110:3-9.

Scott was charged with reckless driving, leaving the scene of an accident, false reporting of a crime, failure to carry a concealed weapon license, and possession of marijuana. ECF No. 69-2, 1-2. In his arrest affidavit, Guzman reported finding a black and silver Smith & Wesson .40 caliber firearm and four plastic baggies with green spots containing suspected marijuana in the stolen vehicle – miles away from where Scott had phoned in his stolen vehicle. ECF No. 69-2, 69-10. Guzman continued to push for the charges even though he never laid eyes on the suspect's face. ECF No. 96-3, 195:3-25. These charges were all dropped. ECF No. 56-1, 120:7-9, 145:4-13.

Scott filed a civil rights lawsuit against the officers and their employer, the City of Miami. ECF No. 1. The complaint consisted of four claims: Scott sued Guzman, Bloom, Carriel, and Hernandez for false arrest under federal and state law. *Id*. at 4-5, 6-7. Scott sued Hernandez for unlawful search, the City of Miami for false arrest, and finally, Scott sued Guzman and Bloom for a state law claim of malicious prosecution. *Id*. at 5-9.

In response to the complaint, the officers and the City filed their motions to dismiss. ECF No. 26 and 27. Under substantially similar facts, the district court

denied their motion. ECF No. 35. In finding that arguable probable cause did not

exist, the district court held:

> Scott reported his car stolen at 6:00 PM. Five minutes later, and two miles away, Officer Guzman saw the stolen Jeep crash and the driver flee the scene. At the same time, Officer Bloom was arriving to the location from where Scott had called the police. To [] find [that] arguable probable cause existed would deem it reasonable for the officers to believe that Scott (i) called the police to report his Jeep stolen just five minutes before driving recklessly past Officer Guzman, crashing into another vehicle, and running away; (ii) traveled two miles back to beat Officer Bloom to Scott's original location; and (iii) managed to put on a black t-shirt somewhere along the way. Such findings would impermissibly draw inferences in favor of Defendants, rather than Scott.

*Id.* at 9-10. The trial court concluded that under these fact, "a reasonable officer

could not have believed that probable cause existed to arrest Scott as the driver of

the stolen Jeep." *Id.* at 9.

During the course of the litigation, Scott deposed the officers, and they made

significant admissions:

1. Guzman asserted that he had probable cause to arrest Scott because he observed a six-foot-two, heavyset, Black male running northbound. ECF No. 69-3, 136:15-20, 23.
2. Guzman was unaware of the type or color of pants worn by the driver. ECF No. 69-3, 165:7-9, 69-6, 41:18-25, 42:2.
3. Bloom acknowledged that there was no probable cause to arrest Scott either for reporting his vehicle as stolen or solely based on the physical description as a heavyset Black male, as this description could apply to numerous individuals in Miami. ECF No. 69-8, 99:5-100:7, 119:1-8, 23-24.
4. Carriel and Hernandez admitted that Guzman was unsure whether Scott was the driver. ECF No. 69-6, 163:15-18, 69-9, 111:25-112:2, 9.

The officers and the City filed their Motion for Summary Judgment. ECF No. 58. Scott responded. ECF No. 70. The district court conducted a hearing on the motion. ECF No. 93. At the hearing, Scott argued the first time that Guzman saw Scott was observing Scott's work ID hanging from the stolen car's rear view mirror. ECF No. 93, 16:3-10. Guzman also contended that he saw Scott driving the vehicle, a contention he made only after the lawsuit was filed. *Id*. at 17:15-18:1.

Scott further argued that given that Guzman did not see the face of the individual who crashed the car, Guzman's vague description of a six-foot-two, bald, Black male wearing a white tank top could not constitute probable cause because it would fit a large category of people in this area because the residents are predominantly Black. *Id*. at 19:6-10, 15-19, 21:19-21.

Scott then argued that no reasonable officer could find probable cause existed to arrest Scott when the court considered the information provided by the dispatcher. *Id*. at 29:12-16, 29:20-30:9. Scott argued that Guzman could not reasonably conclude that the person reporting the theft and the driver who crashed the vehicle were the same individual, as Guzman witnessed the crash while simultaneously receiving a dispatch report identifying Scott as located two miles away from the crash scene. *Id*. at 37:14-20.

Ultimately, the district court rejected Scott's arguments and granted the motion for summary judgment. *Id*. at 50:19-21. In its order, the district court held

that there was no material dispute of facts because there was probable cause to arrest

Scott, thus all of Scott's claims failed. ECF No. 83, 7. This district court reasoned

that probable cause existed because:

> (1) the arresting officer, Guzman, was also the witness, (2) Guzman had
> a more detailed, informative description of the suspect — his own, (3)
> there was Scott's photo identification in the Jeep, and (4) only a short
> time had elapsed between Guzman's last observation of the suspect and
> Scott's arrest.

*Id*. Finally, the district court concluded that the claim against the City failed under

Fla. Stat. § 768.28(9)(a) because "there is no evidence that the officers' actions were

done with malice or bad faith because there was probable cause for the detention and

arrest." *Id*. It made this conclusion even though the City did not request for judgment

on sovereign immunity grounds. *See* generally ECF No. 58. Only the officers raised

a sovereign immunity defense at summary judgment, but the district court did not

rule on that question presented by those defendants. *Id*. at 19, ECF No. 83, 7.

The district court subsequently entered final judgment in favor of the officers

and the City. ECF No. 84.

Scott timely appealed the district court's rulings. ECF No. 85.

## SUMMARY OF THE ARGUMENT

The central issue in this appeal is whether, as a matter of law, the City of Miami police officers possessed actual and or arguable probable cause to arrest Samuel Scott based on their belief that he had stolen his own vehicle. The answer is no.

At the summary judgment stage, Scott presented the following evidence: (1) Scott, who reported his vehicle stolen, did not match the thief's physical description, except for being a big Black bald man in a predominantly black area of Miami, (2) Scott's clothing did not match the suspected thief's clothing, (3) Officer Guzman, the eyewitness, did not see the face of the fleeing suspect when the suspect crashed Scott's vehicle, (4) within eight minutes, Scott could not have possibly run two miles south from the crash scene while the suspect was last seen fleeing north, and (5) Bloom, the initial officer who made contact with Scott, concluded that Scott did not appear to have come back from a run and that there was nothing suspicious about his behavior when they met.

The district court disregarded these critical facts that vitiated actual and arguable probable cause and adopted the Appellees' version of the facts. In doing so, the district court failed to consider the totality of the circumstances or the evidence in the light most favorable to the non-moving party, Scott. The district court concluded, as a matter of law, that probable cause existed for Scott's arrest as

the suspected car thief because of Guzman's observation of a big Black bald man.

This conclusion was reached despite the fact that Scott could not possibly be in two places at once and there were material discrepancies between the suspect and Scott's appearance. Guzman also gave conflicting reports regarding whether he saw the suspect's face; a jury is entitled to believe the report that he did not.

Under Scott's version of the facts, a reasonable jury could find that the Appellees' lacked actual and arguable probable cause to arrest him. Thus, entitling Scott to relief on his federal and state law claims.

The district court erred in granting the City summary judgment on the issue of sovereign immunity because the City neither requested this relief and the Court did not provide notice that it would rule on this basis. In any event, Scott presented a jury question on the issue because the record evidence shows that the City would be liable some of its officers' conduct.

Finally, this Court should reject the continued application of the qualified immunity doctrine because its application infringes upon the exclusive role of the legislature and is inconsistent with legislative intent.

For these reasons, and others, this Court should reverse the district court's order and allow Scott to proceed to trial on the merits.

## ARGUMENT

### I. The district court erred granting summary judgment on Scott's federal claims.

The district court erred in granting summary judgment because Scott presented a genuine issue of material fact. This Court reviews an order granting summary judgment *de novo*, "applying the same legal standard the district court used." *McCabe v. Sharrett*, 12 F. 3d 1558, 1560 (11th Cir. 1994).

Summary judgment is appropriate when "there is no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts." *Burton v. City of Belle Glade*, 178 F. 3d 1175, 1187 (11th Cir. 1999).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," so they are not appropriate determinations to make at the summary judgment stage. *Anderson*, 477 U.S. at 255. "***The evidence of the non-movant is to be believed***, and all justifiable inferences are to be drawn in his favor." *Id.* (emphasis added).

This standard equally applies in civil rights cases. *See Tolan v. Cotton*, 134 S.

Ct. 1861, 1866 (2014) ("This is not a rule specific to qualified immunity; it is simply

an application of the more general rule that a 'judge's function' at summary

judgment is not 'to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial.'").

### Federal Claims

Scott presented a jury question on his unlawful seizure and search claims.

Below, the Appellees asserted that they were entitled to qualified immunity for

Scott's unlawful seizure and search claims. To be entitled to qualified immunity, a

defendant must first establish that they were acting within their discretionary

authority in performing a contested act before "the burden shifts to the plaintiff to

show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F. 3d 1188,

1194 (11th Cir. 2002). Specifically, the defendant must show that he was: (a)

performing a legitimate job-related function (that is, pursuing a job-related goal), (b)

through means that were within his power to utilize. *McCoy v. Webster*, 47 F. 3d

404, 407 (11th Cir. 1995).

Once a government official has shown that he was acting within his

discretionary authority, the burden shifts to the plaintiff to show that qualified

immunity is inappropriate. The plaintiff demonstrates this by establishing that the

defendant violated a constitutional right and that the right was clearly established.

*Saucier v. Katz*, 533 U. S. 194, 201 (2001); *Hope v. Pelzer*, 536 U. S. 730, 739

(2002). In this Circuit, a plaintiff can show that a right is clearly established by

demonstrating the following: (1) "that a materially similar case has already been

decided, giving notice to the police;" (2) "that a broader, clearly established principle

should control the novel facts in this situation;" or (3) "this case fits within the

exception of conduct which so obviously violates [the] constitution that prior case

law is unnecessary." *Mercado v. City of Orlando*, 407 F. 3d 1152, 1159 (11th Cir.

2005).

### Seizure

On his unlawful seizure claim, Scott presented a jury question because a

reasonable jury could believe that he was arrested without probable cause. The

Fourth Amendment protects the right of individuals to be free from unreasonable

seizures. U.S. Const. amend. IV. A seizure takes place "whenever a police officer

accosts an individual and restrains his freedom to walk away." *Terry v. Ohio*, 392

U.S. 1, 16 (1968). An arrest is a seizure. *Torres v. Madrid*, 141 S. Ct. 989, 995

(2021). The Fourth Amendment requires an arrest to be supported by probable cause.

*Maryland v. Pringle*, 540 U.S. 366, 370 (2003).

"Probable cause to arrest exists when an arrest is objectively reasonable based

on the totality of the circumstances." *Rankin v. Evans*, 133 F. 3d 1425, 1435 (11th

Cir. 1998). "This standard is met when 'the facts and circumstances within the

officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id*.

In considering the knowledge of the police officer, this Court, the Supreme Court, and the Florida Supreme Court consider the collective knowledge of his fellow officers. *See Terrell v. Smith*, 668 F. 3d 1244, 1252 (11th Cir. 2012) ("[B]oth the United States Supreme Court and the Florida Supreme Court have allowed the collective knowledge of the investigating officers to be imputed to each participating officer."). "The fellow officer rule allows an arresting officer to assume probable cause to arrest a suspect from information supplied by other officers." *Id*. "[T]he rule works both ways: to validate an arrest when the responsible officers have probable cause and to vitiate it when, as here, none objectively exists." *Reza v. State*, 163 So. 3d 572, 576 n.4 (Fla. 3d DCA 2015).

Under the totality of the circumstances, a reasonable jury could find that the officers lacked probable cause to arrest Scott as the suspected car thief.

First, Scott, who reported his car stolen, did not match the thief's physical description, except for sharing general characteristics that could fit a large category of individuals in that area. Guzman observed the back of a 6'2" heavyset black male wearing a white tank top and shorts fleeing the crash scene northbound. ECF No. 69- 2, 2. Scott was four inches shorter than the suspect. *Id*. at 1.

In earnest, the only features the suspect shared with Scott were that he was a big bald Black man. In that area, this description was too vague to establish probable cause, as it describes a large category of people. ECF No. 69-3, 90:22-91:1; *see Goodson v. City of Corpus Christi*, 202 F. 3d 730, 737 (5th Cir. 2000) (holding that because the plaintiff matched the description "tall, heavy-set, white man dressed as a cowboy" only insofar as he was a "tall, heavy-set, white man," the description was "too vague, and fit too many people," to justify a Terry stop); *cf. Bell v. Neukirch*, 979 F. 3d 594, 604-06 (8th Cir. 2020) (finding no probable cause where both the plaintiff and suspect were "black male juveniles wearing white t-shirts," but the plaintiff was taller and had different colored shorts and socks than the suspect). For example, Scott had a beard at the time of the arrest. There's no indication whether the suspect had a beard (similar to Scott) or any distinguishing facial features for that matter.

Second, Scott's clothing did not match the suspect's clothing. Scott was wearing a black shirt, not a white tank top. ECF No. 56-1, 137:4-6, 69-2, 2. Scott was wearing blue jeans, not the shorts that Guzman disclosed to Carriel. ECF No. 69-6, 41:18-25, 42:2. Admittedly, Guzman did not know the color or type of pants the suspect was wearing. ECF No. 69-3, 165:7-9, 69-6, 41:18-25, 42:2.

Finally, Scott was located two miles away from the crash scene, in the opposite direction from which the suspect had fled on foot. ECF No. 69-2, 2, 69-4,

1, 69-10. The suspect had fled northbound, and Scott was located southbound. *Id*.

The dispatcher had reported to all on-duty officers that Scott's car had been stolen

by an unknown assailant and had provided Scott's name, telephone number, and

location. ECF No. 69-10; *cf. State v. Maynard*, 783 So. 2d 226, 229 (Fla. 2001) ("The

ample information in the hands of the dispatcher regarding Ms. Steele's identity is

constructively imputed to Officer Hall because Florida courts apply the "fellow

officer rule," which operates to impute the knowledge of one officer in the chain of

investigation to another."). Guzman witnessed the crash at the same time that he and

his fellow officers received the dispatch report locating Scott two miles away from

the crash scene. ECF No. 69-4, 1, 69-10. When the initial officer met with Scott

within eight minutes of the crash two miles away, Scott was not sweating profusely,

out of breath, or exhibiting any signs of suspiciousness. ECF No. 69-8, 46:11-22,

64:1-4, 99:5-100:7, 119:1-8, 23-24, 254:8-9, 12-17.  Therefore, it was virtually

impossible for Scott to be the suspected thief.

In granting summary judgment, the district court contravened a fundamental

tenet of the summary judgment process, which requires the facts to be construed in

favor of the nonmovant, Scott.

First, the district court credited the officer's versions of the events and stated

that Guzman saw the suspect, despite evidence to the contrary, such as Guzman's

admission of not seeing the driver's face and his fellow officers' testimony that

Guzman was unsure of the driver's identity. ECF No. 69-6, 163:15-18, ECF No. 69-9, 111:25-112:2, 9, ECF No. 69-3, 166:1-2, 8-9, ECF No. 69-6, 173:13-14, ECF No. 69-9, 110:11-17, ECF No. 83, 7.

Second, the district court accepted Guzman's vague description of the suspect as detailed and disregarded the clear discrepancies in terms of height and clothing. ECF No. 56-1, 137:2-10, ECF No. 69-2, 1, ECF No. 83, 7.

Third, the district court interpreted Guzman finding Scott's photo identification in Scott's stolen Jeep as incriminating evidence, even though there was a reasonable explanation for its presence (i.e., Scott kept his personal belongings in his car that the suspect stole). ECF No. 83, 7. The jury is allowed to reach a different inference from the evidence than the district court reached.

Finally, the district court disregarded the collective knowledge of the officers in determining the lack of probable cause. ECF No. 83, 7.

When considering the collective knowledge of the officers, a reasonable jury could find that probable cause did not exist under the facts viewed in the light most favorable to Scott. It would be unreasonable to believe probable cause existed to arrest Scott as the suspected thief. For Scott to have been the car thief, he would have had to do all of the following within 8 minutes, (1) Scott reported to the police that his car was stolen (ECF No. 56- 1, 52:25-53:1), (2) tell the police to meet him two miles south (ECF 69-10), (3) crashed the vehicle (ECF No. 69-2, 2), (4) exited the

vehicle and run on foot in the opposite direction where he told the police to meet him (ECF No. 69-2, 2), (5) changed his clothes into a black t-shirt and blue jeans (ECF No. 56-1, 137:2-10, 69-2, 1), (6) receive a call from Bloom and speak to Bloom (as he's running) (ECF No. 56- 1, 53:2-6.), (7) wave Bloom down from his aunt's house (*Id.*), and (8) meet up with Bloom who stated that Scott did not look like he came from a run and exhibited no suspicious behaviors (ECF No. 69-8, 254:8-9, 12-17, ECF No. 69-8, 46:11-22; 64:1-4). This is unreasonable and does not amount to probable cause. *See Ill. v. Rodriguez*, 497 U.S. 177, 185 (1990) (Holding that police officers, when performing a warrantless seizure, are not required to be perfect, but they must "always be reasonable.").

Under substantially similar facts, the district court found these inferences would be impermissible and unreasonable. ECF No. 35, 9 (stating that "a reasonable officer could not have believed that probable cause existed to arrest Scott as the driver of the stolen Jeep."). It should have concluded the same at the summary judgment stage and for that it erred.

### Search

The Fourth Amendment also protects citizens from unreasonable searches. U.S. Const. amend. IV. A "search" occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. *United States v. Jacobsen*, 466 U.S. 109, 113 (1989). A warrantless search is *per se* unreasonable under the

Fourth Amendment unless it falls within one of several specifically established and well-delineated exceptions. *Mincey v. Arizona*, 437 U.S. 385, 390 (1978).

The "search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment." *United States v. Robinson*, 414 U.S. 218, 224 (1973). A "lawful arrest" means "an arrest based on probable cause." *Virginia v. Moore*, 553 U.S. 164, 177 (2008). The Supreme Court has indicated that "[i]t is axiomatic that an incident search may not precede an arrest and serve as part of its justification." *Sibron v. New York*, 392 U.S. 40, 63 (1968). In other words, probable cause to arrest must have existed prior to the time of the search. *See United States v. Banshee*, 91 F. 3d 99, 102 (11th Cir. 1996) ("Because there was probable cause for the arrest before the search and the arrest immediately followed the challenged search, the fact that [defendant] was not under arrest at the time of the search does not render the search incident to arrest doctrine inapplicable."). As explained above, probable cause was lacking for the arrest, thus, the search does not qualify under the search incident to a lawful arrest exception.

Below, Hernandez argued that he was allowed to search Scott based on the frisk exception. Under *Terry*, police officers are allowed to perform a limited search of a person (i.e., frisk). 392 U.S. at 27, 29. When an officer reasonably believes that a suspect threatens his safety or the safety of others, he may search the suspect and seize concealed objects that he reasonably believes may be weapons or other

instruments of assault. *Id.* To frisk a suspect, an officer "conduct[s] a carefully limited search of the ***outer clothing*** of [the suspect] . . . to discover weapons which might be used to assault him." *Id*. at 30. And if an officer "feels a concealed object that he reasonably believes may be a weapon," he may continue the search beyond the outer clothing "by searching [the suspect's] pocket" and removing the concealed object. *United States v. Clay*, 483 F. 3d 739, 744 (11th Cir. 2007). "The sole justification of the search [of a suspect] is the protection of the police officer and others nearby," *Terry*, 392 U.S. at 29, so a frisk must remain "reasonably related in scope to the circumstances which justified the [frisk] in the first place," *Id*. at 20.

The evidence indicates that Hernandez conducted an unlawful search. Hernandez knew the following before he searched Scott:

1. Scott reported his vehicle and provided his name, address, and location. ECF No. 69-10.
2. Scott was wearing a black t-shirt and blue jeans (which did not match the suspect's description). ECF No. 56-1, 137:2-10, 69-2, 1, ECF No. 69-6, 41:18-25, 42:2.
3. The dispatcher and Bloom were either present and or in communication with Scott at the same time Guzman observed the suspect crashing the Jeep two miles away. ECF No. 56-1, 53:2-6, ECF No. 69-2, ECF No. 69-4, ECF No. 69-10.
4. The fleeing suspect ran on foot northbound and Scott was located south of the crash scene miles away. ECF No. 69-2.
5. Bloom, who initially made contact with Scott, had no suspicion of criminal activity. ECF No. 69-8, 46:11-22; 64:1-4.
6. Scott was polite to the officers and did not pose a threat to the officers or anyone else. ECF No. 50, Guzman BWC 1, Guzman BWC 2,

Guzman BWC 3, Carriel BWC, ECF No. 81:6-83:12, ECF No. 69-8, 82:18-21, 69-9, 145:5-9.

7.  Hernandez's interaction with Scott occurred in broad daylight with four officers present. ECF No. 50, Guzman BWC 1.

8.  Guzman stopped Hernandez's initial search. ECF No. 50, Guzman BWC 1, T22:47:03Z -T22:47:33Z.

9.  Guzman did not see the fleeing suspect's face or provide any distinguishing facial features. ECF No. 69-2, ECF No. 69-3, 166:1-2, 8-9.

10. Hernandez's initial pat-down search did not reveal any weapons or evidence of criminal activity; thus, Hernandez was not entitled to search Scott for a second time. ECF No. 50, Carriel BWC T22:47:14Z - T22:49:01Z, Carriel BWC, T22:50:08Z - T22:50:22Z.

Given these facts, Hernandez lacked reasonable suspicion to search Scott.

## Clearly Established

The officers lacked arguable probable cause to arrest Scott as the suspected car thief. This Court has framed the "clearly established" prong of the qualified immunity doctrine as an "arguable probable cause" inquiry. Under this inquiry, arguable probable cause may be found where "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest." *Lee*, 284 F. 3d at 1195. The arguable probable cause inquiry is objective, ignoring an officer's subjective motivation. *Carter v. Butts Cnty., Ga.*, 821 F. 3d 1310, 1320 (11th Cir. 2016).

No reasonable police officer could have believed that probable cause existed to arrest Scott as the suspected car thief, given the following facts:

1. Scott, who reported his vehicle stolen, did not match the thief's physical description, except for being a big, bald black male in Miami. ECF No. 69-2, 1-2, ECF No. 69-10.

2. Scott's clothing did not match the suspected thief's clothing. ECF No. 56-1, 137:2-10, ECF No. 69-2, 1, ECF No. 69-6, 41:18-25, 42:2.

3. Within eight minutes, Scott could not have been located two miles south when the suspect fled north. ECF No. 69-2, 69-4, 69-10.

4. Guzman, the eyewitness, did not see the face of the fleeing suspect. ECF No. 69-3, 166:1-2, 8-9.

5. Bloom, the initial officer who made contact with Scott, concluded that Scott did not come back from a run and that there was nothing suspicious about him. ECF No. 69-8, 254:8-9, 12-17, ECF No. 69-8, 46:11-22; 64:1-4. In fact, Bloom and the district court concluded that such an arrest would be unreasonable. ECF No. 35, 9, ECF No. 69-8, 99:5-100:7, 119:1-8, 23-24.

Furthermore, no reasonable officer could have believed that the generic description provided the Appellees with probable cause to arrest Scott. *See United States v. Jones*, 619 F.2d 494, 496, 498 (5th Cir. 1980) (The former Fifth Circuit found that neither probable cause nor reasonable suspicion existed to seize the defendant based on the fact that he matched a physical description of the suspect because the description was very general and could have fit many people.).

Finally, no reasonable officer could believe that Hernandez had arguable reasonable suspicion to frisk Scott twice, when he posed no danger to the officers or himself and had been described as "polite". *Terry*, 392 U.S. at 27, 29; ECF No. 50, Guzman BWC 1, Guzman BWC 2, Guzman BWC 3, Carriel BWC, ECF No. 81:6-83:12, ECF No. 69-9, 145:5-9. The evidence shows that Hernandez removed Scott's wallet and personal belongings after he patted Scott down, even though the initial

search did not reveal any weapons. ECF No. 50, Carriel BWC T22:47:14Z -

T22:49:01Z. After Guzman stopped Hernandez's initial search, Hernandez searched

Scott again and lifted up his black t-shirt to reveal his white undershirt. ECF No. 50,

Carriel BWC, T22:50:08Z - T22:50:22Z. No reason officer could believe that

reasonable suspicion existed under these circumstances.

## II. The district court erred granting summary judgment on Scott's state claims.

### Sovereign Immunity

Florida has waived sovereign immunity for intentional torts and negligent acts

of its employees. Fla. Stat. § 768.28 (2018). The statute provides that the State and

its subdivisions are subject to suit in for tort claims "in the same manner and to the

same extent as a private individual under like circumstances." Fla. Stat. § 768.28(1).

The statute shields employees from liability unless it is shown that they have "acted

in bad faith or with malicious purpose or in a manner exhibiting wanton and willful

disregard of human rights, safety, or property." *Id.* at 9(a), *see also Butler v.

Gualtieri*, 41 F. 4th 1329, 1339 (11th Cir. 2022) ("Florida's sovereign immunity

statute protects government officials when their subordinates act in bad faith, or with

malicious purpose, or a wanton and willful disregard of human rights or safety".).

While the statute does not provide specific definitions for the terms "in bad

faith," "with malicious purpose," or "in a manner exhibiting wanton and willful

disregard of human rights or safety," these phrases have been defined through case

law. "Bad faith" has been equated to the "actual malice standard." *Peterson v.*

*Pollack*, 290 So. 3d 102, 109 (Fla. 4th DCA 2020). "Malicious purpose" is

interpreted to mean that the conduct was carried out with elements of "ill will, hatred,

spite, [or] an evil intent." *Id*. Furthermore, "wanton and willful disregard of human

rights [or] safety" is characterized as behavior that goes beyond mere intentional

conduct and is more reprehensible and unacceptable than gross negligence." *Lemay*

*v. Kondrk*, 923 So. 2d 1188, 1192 (Fla. 5th DCA 2006).

The sovereign immunity inquiry concerns whether an employee or the agency

should be held liable for the employee's conduct. *See McGhee v. Volusia Cty.*, 679

So. 2d 729, 733 (Fla. 1996) ("That veil [shielding the employee from liability] is

lifted only where the employee's act [fall] outside the scope of employment, in

which event sovereign immunity then shields the employing agency from liability.").

"In any given situation either the agency can be held liable under Florida law, or the

employee, but not both." *Id*.

The district court erred in granting the City sovereign immunity at the

summary judgment stage. The district court concluded that Scott's claims failed

against the City under the sovereign immunity statute because "there is no evidence

that the officers' actions were done with malice or bad faith because there was

probable cause for the detention and arrest." ECF No. 83, 7.

 For starters, the City never moved for summary judgment based on sovereign immunity. ECF No. 58. Instead, it was the officers who raised the issue of sovereign immunity at summary judgment. *Id*. at 19. It was legal error for the district court to enter sovereign immunity on that issue in the City's favor without notice to the plaintiff. *See Imaging Bus. Machs., LLC v. BancTec, Inc.*, 459 F. 3d 1186, 1191 (11th Cir. 2006) (holding that *sua sponte* grant of summary judgment without notice to the parties constitutes reversible error).

In any event, Scott presented a jury question on whether some of the officers would be entitled to sovereign immunity for his state law claims. Scott's imprisonment and prosecution resulted from at least wanton and willful conduct and, as demonstrated above, a lack of probable cause.

The record indicates that Guzman did not see the face of the person driving and crashing Scott's vehicle. ECF No. 69-3, 166:1-2, 8-9. The officers, either individually or collectively, were unaware of the identity of the car thief, but they knew that Scott had called from a location two miles away at the time of the crash – a fact which made it impossible for Scott to be the thief. ECF No. 56- 1, 52:25-53:1, ECF No. 69-6, 163:15-18, ECF No. 69-9, 111:25-112:2, 9, ECF No. 69-10. They were aware that the suspect was a heavyset baldheaded Black male wearing a white tank top and running northbound, and observed that Scott did not fit the description in height or clothing. ECF No. 50, Guzman BWC 1, T22:45:35Z, ECF No. 69-2, 2.

In fact, they expressed open doubts about whether Guzman saw Scott. ECF No. 69-6, 173:13-14, ECF No. 69-6, 163:15-18, ECF No. 69-9,, 111:25-112:2, 9.

On the other hand, Bloom acknowledged that Scott was not a criminal suspect and did not appear to be someone who came from a run. ECF No. 69-8, 254:8-9, 12-17, ECF No. 69-8, 46:11-22; 64:1-4. Bloom admitted that there was no probable cause to arrest someone for reporting his car stolen. ECF No. 69-8, 99:5-100:7, 119:1-8, 23-24. Despite having this information, the officers hastily made the arrest, expressed impatience over not arresting Scott quickly enough, and even applauded after Scott was escorted to the car. ECF No. 69-9, 108:18-21, ECF No. 50, Carriel BWC T22:49:37Z - T22:50:27Z, ECF No. 50, Carriel BWC, T22:54:09Z - T22:54:18Z. A reasonable jury could find that the officers exhibited wanton and willful conduct. *See Butler*, 41 F.4th at 1337-38 (recognizing that Florida's sovereign immunity determinations are fact specific and cannot easily be decided on summary judgment.).

For similar reasons, this Court should deny any request by the defendant-officers to affirm the summary judgment on their sovereign immunity claims. Although their claims were preserved below, those claims fail for the reasons stated above.

Thus, the district court erred granting summary judgment on the basis of sovereign immunity.

## False Arrest

Scott presented a jury question on Scott's state law false arrest claim. Under Florida law, the essential elements for false arrest are: "(1) the unlawful detention and deprivation of liberty of a person; (2) against that person's will; (3) without legal authority or color of authority; and (4) which is unreasonable and unwarranted under the circumstances." *Mathis v. Coats*, 24 So. 3d 1284, 1289-90 (Fla. 2d DCA 2010) (internal citations omitted). As discussed, "[p]robable cause is an affirmative defense to a false arrest claim." *Miami-Dade Cnty. v. Asad*, 78 So. 3d 660, 669-670 (Fla. 3d DCA 2012). Furthermore, "the standard for determining probable cause is identical under both Florida and federal law." *Rankin*, 133 F. 3d at 1435. Since the record evidence demonstrates a jury issue regarding actual probable cause in Scott's federal claim, Scott has also raised a jury question concerning his state claim. However, if this Court finds that arguable probable cause existed on the federal claim, Scott may still proceed on his state claim because arguable probable cause does not defeat a state law claim of false arrest. *See Gold v. City of Miami*, 121 F. 3d 1442, 1445 (11th Cir. 1999) ("arguable probable cause is distinct from actual probable cause.").

## Malicious Prosecution

Scott presented a jury question on his malicious prosecution claim. To prevail in an action for malicious prosecution under Florida law, a plaintiff must show: (i) that an original criminal or civil judicial proceeding was commenced or continued,

(ii) that the defendant was the legal cause of the judicial proceeding, (iii) that the

judicial proceeding was terminated in the plaintiff's favor, (iv) that probable cause

for the proceeding was absent, (v) that malice was present, and (vi) that the plaintiff

suffered resulting damage. *Burns v. GCC Beverages, Inc.*, 502 So. 2d 1217, 1218

(Fla. 1986).

The district court reasoned that the malicious prosecution claim failed because

officer Guzman had probable cause to arrest him as the suspected car thief. Since

the record evidence demonstrates a jury issue on the absence of probable cause in

Scott's federal claims, then Scott has also raised a jury question concerning his

malicious prosecution claim. *See also Mancusi*, 632 So. 2d at 1357 ("When the facts

relied on to show probable cause are in dispute, their existence is a question of fact

for the determination of the jury [.]").

If Guzman argues that he was not the legal cause of Scott's prosecution, as he

did in the district court, Scott has also raised a jury question on this element. In a

malicious prosecution action, the element of legal causation is established where a

defendant gave information to authorities which he or she knew or should have

known to be false which was "the determining factor in inducing the [prosecutor]'s

decision." *Orr v. Belk Lindsey Stores, Inc.*, 462 So. 2d 112, 114 (Fla. 5th DCA 1985);

*Buchanan v. Miami Herald Publ'g Co.*, 230 So. 2d 9, 11 (Fla. 1969) (noting that

"[a]ctual knowledge is not required" and holding that a complaint which alleges a

defendant knew or should have known that the charge was false and that no probable

cause existed was sufficient to state a cause of action for malicious prosecution). A

defendant may also be held liable where he or she withholds information which

could have caused the cessation of criminal proceedings against the plaintiff. *See*

*Harris v. Lewis State Bank*, 482 So. 2d 1378, 1381-82, 1382 n. 9, 1383 n.16 (Fla. 1st

DCA 1986). This is because "there can be no intelligent exercise of the

[prosecutor's] discretion." *Id*. at 1382 n. 9.

The record reveals that Guzman was unaware of the car thief's identity.

Despite not seeing the car thief's face, Guzman claimed that Scott was the car thief.

ECF No. 69-6, 163:15-18, ECF No. 69-9, 111:25-112:2, 9. The facts available to

Guzman clearly indicated that it was implausible for Scott to be the car thief, given

the distance from the crime scene and the discrepancy in their physical appearances.

ECF No. 56-1, 137:2-10, ECF No. 69-2, 1, ECF No. 69-4, 1, ECF No. 69-10.

Guzman pursued the erroneous charges. ECF No. 96-3, 195:3-25. Bloom himself

admitted the absence of probable cause to arrest Scott for reporting his stolen

vehicle. ECF No. 69-8, 99:5-100:7, 119:1-8, 23-24. Considering this evidence, a jury

could reasonably conclude that Guzman was the legal cause of Scott's prosecution.

### III.    Qualified immunity is unconstitutional.[2]

Qualified immunity is unconstitutional because the doctrine infringes on the role exclusively reserved for Congress. The doctrine is unsupported by the text of the Civil Rights Act (the "Act") and contrary to the legislative intent.

In its original form, the Act stated:

> That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, *any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding*, be liable to the party injury in any action at law, suit in equity, or other proper proceeding for redress[.]

Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871) (emphasis added). Notably, the "Notwithstanding Clause" of the Act, provided for liability for any violation of constitutional rights, notwithstanding any "custom" or "usage" "of the State".

In 1871, the terms "custom" or "usage" were equivalent to the common law. *See Wheaton v. Peters*, 33 U.S. 591, 659 (1834) ("The judicial decisions, the usages and customs of the respective states" established the "common law."); *Strother v. Lucas*, 37 U.S. 410, 436-437 (1838) ("Every country has a common law of usage

---

[2] Based on the principle of *stare decisis*, Appellant acknowledges that qualified immunity is the law, as erroneous as it may be, and as a lower court, this Court must follow it. However, Appellant makes this argument in good faith to change existing law and preserve the argument for Supreme Court review. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2261 (2022)("adherence to precedent is not 'an inexorable command.' There are occasions when past decisions should be overruled.").

and custom . . . ."). In fact, the Supreme Court and the lower courts consistently interpreted this Act without any regards to the qualified immunity defense during the first 100 years of its existence. *Baxter v. Bracey*, 140 S. Ct. 1862, 1863 (2020).

The "Notwithstanding Clause" was inexplicably left out by the Reviser of the Federal Statutes in the initial federal law compilation in 1874. *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201, 207 (2023); *Rogers v. Jarrett*, 63 F.4th 971, 980 (5th Cir. 2023). This omission was further perpetuated when the Revised Statutes were incorporated into the United States Code. *Id.*

In creating the qualified immunity doctrine, the Supreme Court interpreted the Reviser's version of the statute. In *Pierson v. Ray*, the Supreme Court reasoned and held that:

> The legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities. Accordingly, this Court held . . . that the immunity of legislators for acts within the legislative role was not abolished. The immunity of judges for acts within the judicial role is equally well established, *and we presume that Congress would have specifically so provided had it wished to abolish the doctrine*.

386 U.S. 547, 554-555 (1967) (emphasis added). The foundation of the qualified immunity doctrine was based on the premise that Congress did not explicitly state its intention to abolish state law immunities. However, this assumption was incorrect, as the text of the original act, clearly contradicts this premise.

"[I]t's a 'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary . . . meaning . . . at the time Congress enacted the statute.'" *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019); *see also Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020) ("This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment. After all, only the words on the page constitute the law adopted by Congress and approved by the President."). When considering the text's ordinary meaning in 1871, it is clear that Congress never intended for state law immunities to be an obstacle to providing relief for civil rights litigants.

The continued adherence to the qualified immunity doctrine violates the fundamental notions of separations of power. The Constitution does not permit the judiciary to create immunities to further public policy. That is a role designated for Congress. *See Tower v. Glover*, 467 U.S. 914, 922-23 (1984) ("We do not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy. It is for Congress to determine whether § 1983 litigation has become too burdensome to state or federal institutions and, if so, what remedial action is appropriate."). This Court should reject the continued application of the qualified immunity doctrine.

## **CONCLUSION**

For the foregoing reasons, this Court should reverse the district court's order.

**CERTIFICATION**

I certify that a copy hereof has been electronically filed with the Clerk of the

Court on or about October 13, 2023. I certify that a copy hereof has been

electronically served on Lourdes Wydler, 2600 Douglas Road Suite Ph-4, Coral

Gables, FL 33134, [lew@marrerolegal.com](mailto:lew@marrerolegal.com) and Brandon Luis Fernandez, 444 SW

2nd Ave Suite 945, Miami, FL 33130, [Bfernandez@miamigov.com](mailto:Bfernandez@miamigov.com).

PIERRE **SIMON**
Attorneys for Appellant
600 Southwest 4th Avenue,
Fort Lauderdale, Florida 33315

By: s/ Faudlin Pierre
Faudlin Pierre, Esq.
FBN. 56770
fplaw08@yahoo.com
(305) 336-9193

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rules of Appellate Procedure 32(g)(1) I certify that this

document complies with the type-volume limitation required for motions.

/s/Faudlin Pierre_____
Faudlin Pierre