[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————————

No. 23-11280

————————————————

SAMUEL SCOTT, JR.,

Plaintiff-Appellant,

*versus*

CITY OF MIAMI,
JONATHAN GUZMAN,
MICHAEL BLOOM,
MIGUEL HERNANDEZ,
RANDY CARRIEL,

Defendants-Appellees.

————————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-cv-23995-PCH

————————————————

Before WILLIAM PRYOR, Chief Judge, JORDAN, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

This appeal requires us to decide whether the eyewitness identification by a patrol officer of a driver, seen speeding away from him and ultimately crashing the car, was sufficient to establish probable cause to arrest the driver. Under the facts and circumstances of this case, we hold that it was.

Sometime after 6pm on June 1, 2018, Officer Jonathan Guzman of the City of Miami Police Department visually identified a speeding driver in a black Jeep Compass. Guzman followed the driver, who eventually crashed into another vehicle and fled the scene on foot. During an inventory search of the Jeep Compass, Guzman discovered a firearm, ammunition, and marijuana. At 6:22pm, the Police Department transmitted a radio dispatch request notifying all on-duty officers of a stolen vehicle, which matched the description of the crashed Jeep Compass.

At 6:30pm, Officer Michael Bloom arrived at the scene of the reported vehicle theft some two miles away from the crash site, where the plaintiff, Samuel Scott Jr., claimed that his black Jeep Compass had been stolen while it was parked near his aunt's home, after he left his keys in the car with the engine running. Having received the dispatch request, Officer Guzman arrived at the scene of the reported vehicle theft soon after, and immediately recognized Scott as the speeding driver who had fled the crash site. Scott claimed that the officers had the wrong man, and that he could not

have possibly arrived at the scene of the reported theft if he had indeed crashed the Jeep Compass only shortly before, but the officers detained and then arrested Scott for reckless driving, fleeing from the scene of an accident, falsely reporting a crime, carrying a firearm without a license, and possessing marijuana.

The various charges brought against Scott were eventually dropped.  Scott thereafter filed federal and state law claims in the Southern District of Florida for unreasonable search and seizure, false arrest and false imprisonment, and malicious prosecution against the officers and the City of Miami.  After the completion of discovery, the district court granted summary judgment for the defendants on all of Scott's claims based on qualified and sovereign immunity.  Because the officers had probable cause to arrest based on Guzman's unequivocal eyewitness identification, we **AFFIRM**.

## I.

### A.

On June 1, 2018, Samuel Scott Jr. called the police to report that his black 2007 Jeep Compass had been stolen at 563 NW 48th Street in Miami, Florida.  Scott could not recall the exact time he made the call, but said that he did so "[a]t approximately 6:00 PM."  Scott told the dispatcher that "[s]omeone jumped in my car and drove off," although he admitted that he did not actually see any of this as it occurred.  According to a computer-aided dispatch ("CAD") report, Officer Michael Bloom of the City of Miami Police Department was dispatched to investigate at 6:22pm, and he arrived at the scene of the reported vehicle theft at 6:30pm.  When

Bloom arrived, he did not see anyone, so he drove another block before returning to the original location, whereupon he saw Scott "walking up the sidewalk waving [his] hand." Bloom said that Scott appeared "disoriented" and he saw "a little sweat coming off [Scott's] forehead," but he did not otherwise find anything suspicious about Scott's behavior.

Scott explained to the officer that his vehicle was stolen after he left the keys in his car and the engine on. He said that he went to visit his aunt's house for "about five to ten minutes." The car was parked on a street adjacent to a nearby park. According to Scott, Bloom did not initially see him because he was sitting in the shade underneath a tree in his aunt's yard. When asked by Bloom why he would "leave [his] keys in the car running," Scott responded that he "didn't know why [he] did that." Bloom told Scott to file a stolen vehicle affidavit and be "truthful" in doing so.

Sometime before the interaction between the plaintiff and Bloom, Officer Jonathan Guzman was independently conducting a radar detail at the intersection of NW 12th Avenue and NW 67th Street in Miami, where he saw a black Jeep Compass traveling southbound at 50 miles per hour in a 30 miles per hour zone. Guzman's arrest affidavit says that he saw the speeding Jeep Compass at 6:05pm on June 1, 2018. Guzman, who was parked facing north at the median just ten feet away, saw through the Jeep's windshield "a heavyset, bald black male with a white tank top." Because the driver was facing Guzman directly, Guzman explained that he "looked at [the driver] for a long period of time as [the driver] was

driving towards [him]." Guzman then made a U-turn and began heading southbound in an attempt to stop the speeding vehicle. He followed the Jeep Compass and turned on his sirens as the vehicle sped away.

Guzman called for backup as the car chase ensued. Guzman observed the vehicle run a stop sign, and it eventually collided with a parked car (with nobody inside) at the intersection of 5th Avenue and NW 71st Street. Again, Guzman observed the driver, whom he described as a "heavyset black male, bald head, wearing a white tank top." The driver quickly exited the vehicle and fled northbound on foot. Guzman briefly chased the driver on foot, until he "lost [a] visual" when the driver ran under the I-95 bridge.

Guzman then searched the crashed Jeep Compass and found a firearm on the passenger side floor, ammunition in the trunk, and four "baggies" of cannabis in the center console. He also saw an employee identification card containing Scott's name and photograph hanging from the rear-view mirror. During Guzman's investigation, Officers Randy Carriel and Brandon Williams arrived at the scene as backup. While Guzman completed his inventory search, he heard a radio transmission on the general police dispatch channel about a stolen vehicle, whose description matched the description of the Jeep Compass involved in the crash. This dispatch was the same one that was relayed to all on-duty officers (including Officer Bloom) at 6:22pm. Guzman and Carriel then drove to the location of the reported vehicle theft, some two miles from the crash site. According to Guzman, it took him "[l]ess than five

minutes" to drive from the crash site to the reported location of the theft.

Guzman testified that he spent "approximately 20 minutes to 30 minutes at the crash scene" before departing for the reported vehicle theft location with Carriel. He asked Williams to stay back and write up the crash report, although Williams did not observe the crash himself. According to Williams, Guzman told him the approximate location and time of the crash, but he was not given any description of the suspect. Williams's crash report identified the time of crash as 6:22pm, based only on "what Officer Guzman told [him] and the CAD report."

When Guzman and Carriel arrived at the scene of the reported vehicle theft, Officers Bloom and Miguel Hernandez were already there. While Bloom had arrived at the scene around 6:30pm, Hernandez joined him at approximately 6:51pm. Only "moments later," Guzman and Carriel arrived. When Guzman first saw Scott, he "immediately recognized him" as the driver of the Jeep Compass who sped away and then crashed the car. After confirming that Scott had signed the stolen vehicle affidavit, Guzman detained him.

Scott repeated that he was "the wrong guy" and offered multiple explanations for why he was not the driver of the speeding car -- he was at work, or he was with his kids -- reasons which Guzman did not credit. Hernandez searched Scott while he was detained. After speaking with his supervisory sergeant, Guzman placed Scott

under arrest and transferred him to the City of Miami Police Officer Station.

Scott was charged with reckless driving, Fla. Stat. § 316.192(3), leaving the scene of an accident, *id.* § 316.061(1), falsely reporting a crime, *id.* § 817.49, carrying a firearm without a license, *id.* § 790.06(1), and possessing marijuana, *id.* § 893.13(6)(b). All of the charges were ultimately dropped.

## B.

Scott commenced this lawsuit in the Southern District of Florida lodging multiple claims against Officers Guzman, Bloom, Hernandez, and Carriel in their individual capacities and against the City of Miami.[1] Scott sued under the Fourth Amendment for unreasonable seizure against all of the officers and unreasonable search against Officer Hernandez pursuant to 42 U.S.C. § 1983, along with filing state law false arrest and false imprisonment claims against all of the officers and the City of Miami, and finally bringing a state law malicious prosecution claim against Officers Guzman and Bloom.

After the completion of all discovery, the defendants moved for summary judgment, asserting that each of Scott's claims was barred based on a finding of probable cause. The district court agreed. It reasoned that the officers were entitled to qualified

---

[1] The initial complaint also named Officer Williams, but the district court later granted the parties' joint stipulation to voluntarily dismiss with prejudice all claims leveled against him.

immunity on the federal claims because they had probable cause to arrest Scott.  The court explained that Officer Guzman had "his own" "detailed, informative description of the suspect" and "only a short time had elapsed" between Guzman's observation and Scott's arrest.  The court concluded that "because Guzman had probable cause, all of Scott's counts fail," including the state law claims against the officers.  Finally, the court determined that there was no evidence the officers acted with malice or bad faith, and accordingly, it ruled for the City of Miami under Florida's sovereign immunity statute on the remaining false arrest claim.  *See* Fla. Stat. § 768.28(9)(a).

Scott timely appealed the district court's decision.

## II.

We review the district court's grant of summary judgment *de novo*, viewing all the evidence in the light most favorable to the non-moving party.  *See Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1177 (11th Cir. 2020) (quoting *Ware*, 906 F.3d at 1311).

## A.

We begin with Scott's claims against the officers for unreasonable search and seizure in violation of the Fourth Amendment.

It is by now hornbook law that "the Constitution permits an officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979).  We have held that

> Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.  Probable cause is not a high bar.  Far from requir[ing] convincing proof that [an] offense was committed, probable cause is a flexible and fluid concept, that looks instead to the totality of the circumstances to determine the reasonableness of the officer's belief that a crime has been committed.  Accordingly, [t]he test for probable cause is not reducible to precise definition or quantification, and [f]inely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the [probable-cause] decision.

*Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019) (alterations in original) (internal quotation marks and citations omitted).

Indeed, "[b]ecause probable cause requires less than a preponderance of the evidence, it necessarily follows that probable cause does not require that it be more likely than not the person arrested for a crime is actually guilty of it." *Davis v. City of Apopka*, 78 F.4th 1326, 1334 (11th Cir. 2023).  "Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a

criminal offense has been or is being committed." *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010); *see also Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996).

Moreover, the presence of contradictory evidence does not bar a finding of probable cause. *See Paez*, 915 F.3d at 1286 ("So long as it is reasonable to conclude from the body of evidence as a whole that a crime was committed, the presence of some conflicting evidence or a possible defense will not vitiate a finding of probable cause."). "Because 'probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts,' a police officer need not resolve conflicting evidence in a manner favorable to the suspect." *Washington v. Howard*, 25 F.4th 891, 902 (11th Cir. 2022) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018)). An officer is "not required to believe [exculpatory evidence] or to weigh the evidence in such a way as to conclude that probable cause did not exist." *Id*. "The probable cause decision, by its nature, is hard to undermine, and still harder to reverse." *Kaley v. United States*, 571 U.S. 320, 339 (2014) (discussing the standard in the grand jury setting). Ultimately, probable cause will only be vitiated if the exculpatory evidence "did not merely make it less likely probable cause existed but *obviously and irrefutably* established that it didn't exist." *Davis*, 78 F.4th at 1343 (emphasis added).

"Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known. The

purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1193–94 (11th Cir. 2002) (internal quotation marks and citations omitted).

Thus, in order to receive qualified immunity, the law enforcement officer "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Id.* at 1194 (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)). In this case, it is undisputed that the law enforcement officers were acting within their discretionary authority when they detained, searched, and arrested Scott. The burden then shifts to the plaintiff, Scott, to establish that qualified immunity is not appropriate. In order to do so, the plaintiff must demonstrate two things: "(1) that the facts, when construed in the plaintiff's favor, show that the official committed a constitutional violation and, if so, (2) that the law, at the time of the official's act, clearly established the unconstitutionality of that conduct." *Singletary v. Vargas*, 804 F.3d 1174, 1180 (11th Cir. 2015). "Because we can discern no constitutional violation, we need not address whether the constitutional right at issue had been clearly established when the incident arose." *McCullough v. Antolini*, 559 F.3d 1201, 1208 (11th Cir. 2009).

Taking the facts in the light most favorable to plaintiff, we conclude that Scott has failed to meet his burden because the

undisputed record establishes that Guzman had probable cause to arrest Scott for reckless driving, fleeing from the scene of an accident, falsely reporting a crime, carrying a firearm without a license, and possessing marijuana.

In general, reliance upon eyewitness testimony, including that of a victim of a crime, is sufficient to establish probable cause. *See Rankin v. Evans*, 133 F.3d 1425, 1441 (11th Cir. 1998) ("Generally, an officer is entitled to rely on a victim's criminal complaint as support for probable cause."); *L.S.T., Inc. v. Crow*, 49 F.3d 679, 684–85 (11th Cir. 1995) (finding probable cause when actions taken by law enforcement "were based upon the victim's complaint and his identification . . . of the persons he accused"). The case for probable cause becomes even stronger here because Miami police officer Guzman relied on *his own* eyewitness testimony to establish that Scott had violated state law. As we observed in *Myers v. Bowman*, 713 F.3d 1319 (11th Cir. 2013), complaints made by "government officials" "were particularly reliable and trustworthy sources" to establish probable cause. *Id.* at 1327.

We begin then with Officer Guzman's opportunity to personally see the crimes that he believed Scott had committed. Guzman testified without any doubt that he had "full vision of the driver" of the speeding Jeep Compass "for a long period of time," and that in fact he was only ten feet away at the closest point when he saw the driver. *See United States v. Harris*, 526 F.3d 1334, 1337–38 (11th Cir. 2008) (per curiam) (concluding that an officer had probable cause to stop the suspect whom he had personally

observed committing a traffic violation). He said at his deposition that: "I looked at him coming, driving southbound on 12th Avenue towards my direction on the same side because I'm parked facing north. So I'm facing him directly. So he's driving within 30, 20, 25, 15, 10 feet, and then he passes me." Although the driver was traveling at 50 miles per hour, Guzman said that he had plenty of time to directly observe him through the windshield of his car. This testimony remains undisputed. Moreover, the events occurred in Miami on June 1, 2018 around 6pm when it was still light outside, since the sun did not set until 8:08pm on that day.[2] Indeed, the body worn camera footage from Officers Guzman and Carriel show that it was still light outside when the officers detained, searched, and arrested Scott.

Guzman's opportunity to identify the speeding driver did not end with seeing him as he drove by. Guzman recounted that he had another opportunity to view the driver, having an unobstructed view of the fleeing driver as the driver exited the crashed vehicle and fled on foot. Again, Guzman described the driver as a "heavyset black male, bald head, wearing a white tank top."

---

[2]     This Court takes judicial notice of the United States Naval Observatory Astronomical Applications Department's "Table of Sunrise/Sunset, Moonrise/Moonset, or Twilight Times for an Entire Year," which lists sunrise and sunset times in a given city for a given year -- here, in Miami in 2018. *See* https://aa.usno.navy.mil/data/RS_OneYear; *see also* Fed. R. Civ. P. 201(b)(2) (permitting a court to "judicially notice a fact that is not subject to reasonable dispute because it" "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

What's more, when Officer Guzman searched the Jeep Compass soon after the crash, he found Scott's employee identification card which contained a picture of Scott, which matched Guzman's prior eyewitness identification of the driver.

Some 30 minutes later, Guzman "immediately recognized" Scott upon arriving at the scene of the reported theft and concluded that Scott was the same individual as the driver of the Jeep Compass. *See Manson v. Brathwaite*, 432 U.S. 98, 114–16 (1977) (finding reliable an officer's identification of a suspect in a photograph "only two days" after the officer saw the suspect for "two to three minutes" "within two feet" in a hallway illuminated by "natural light"). Moreover, in his deposition, Officer Carriel said that Guzman identified Scott as the suspect when Guzman arrived at the scene. Officer Hernandez also testified in his deposition that when Officers Guzman and Carriel arrived on the scene, Scott was positively identified as the suspect. And in Guzman's own arrest affidavit, he wrote that he "was able to ID the suspect that fled the hit and run." This testimony unambiguously established probable cause to arrest Scott.

Even if Guzman ultimately had been mistaken in his eyewitness identification of the plaintiff, his clear visual observation of the driver on two successive occasions, along with seeing a picture identifying Scott in the Jeep Compass, was enough to make it objectively reasonable for Guzman and the other law enforcement officers to believe that Scott had committed an offense. Again, probable cause "is not a high bar" and "requires only a probability

or substantial chance of criminal activity." *Paez*, 915 F.3d at 1286 (quoting *Wesby*, 138 S. Ct. at 586).

Nor does the dismissal of charges, or even an acquittal, vitiate probable cause. *See DeFillippo*, 443 U.S. at 36 ("The validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest."); *see also Brinegar v. United States*, 338 U.S. 160, 174 (1949) (noting the "difference in standards and latitude allowed in passing upon the distinct issues of probable cause and guilt"). "The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted -- indeed, for every suspect released." *Baker v. McCollan*, 443 U.S. 137, 145 (1979).

Scott counters, however, that under his version of the facts, it was not possible for him to have fled from the crashed vehicle at 6:22pm, call the police immediately thereafter to report the theft of his car, and arrive at the location of the alleged car theft, some two miles away to meet Officer Bloom at 6:30pm. In fact, it would have been remarkable for Scott to have run nearly two miles in just eight minutes. The problems with Scott's defense, however, are multiple. In the first place, as we have observed, probable cause is not a high bar. It does not require a preponderance of the evidence, nor does it require the officers to rule out a suspect's innocent explanation. In fact, probable cause will only be vitiated if the exculpatory evidence "did not merely make it less likely probable cause existed

but obviously and irrefutably established that it didn't exist." *Davis*, 78 F.4th at 1343.

In the second place, Scott's entire argument turns on Officer Williams's crash report, which said that the crash occurred at 6:22pm. As we have already observed, however, Williams was not at the scene when the crash occurred and only received that information from Guzman and the CAD report. What's more, Guzman undisputedly received the dispatch request alerting him of the vehicle theft at 6:22pm, during the course of his inventory search, which likely occurred at least a few minutes after the Jeep Compass had crashed.

In the third place, even if the arresting officers on the scene somehow were required to accept as written in stone the time of the crash being exactly 6:22pm, it is altogether plausible to believe that Scott did not actually run on foot from the crash site to the scene of the purported car theft, but rather took another form of transportation -- maybe a bicycle, an electric scooter, or another vehicle -- to get there. While running some two miles in eight minutes for a heavyset individual is a remote possibility, traveling that distance on wheels is not. Again, Guzman said that it took him "[l]ess than five minutes" to drive from the crash site to the purported theft site.

In the fourth place, the officers had still another objectively reasonable basis to discredit Scott's explanation which relied, after all, on his statement that he left his car parked with the engine

running and the keys in the ignition near his aunt's house as he went in for a visit.

Scott also claims that the arresting officer's account ought not to be believed because Guzman twice said the driver was wearing a "white tank top," when in fact Bloom first saw him at the scene of the alleged theft wearing a "black T-shirt" over a white "undershirt." Again, Scott could easily have placed his black shirt on over the white tank top while fleeing from the crash site. What's more, and perhaps even more basic to the officer's eyewitness identification, it is undisputed that Guzman's description of the fleeing driver being "a heavyset, bald black male" matched a description of Scott.[3]

---

[3]    As we see it, our concurring colleague's argument that the record only establishes "arguable probable cause" fails to come to grips with controlling law in this Court, which holds that probable cause, when established by an eyewitness identification made by a police officer, may be vitiated only when the exculpatory evidence *"obviously and irrefutably* established that it didn't exist." *Davis*, 78 F.4th at 1343 (emphasis added). The essential hypothesis that Scott could not have traveled two miles on foot in some eight minutes does not "obviously and irrefutably" rebut the officer's identification. Again, Scott easily could have traveled those two miles on wheels rather than on foot; Officer Guzman had multiple opportunities to see Scott up close and in person; and Scott's own account of the critical events was readily unbelievable. Nor does the dispute over whether Scott wore a black T-shirt or a white tank top create an irrefutable rebuttal when the shirts were readily interchangeable, and the basic identification remained the same.

We repeat that a finding of probable cause does not require a preponderance of the evidence; probable cause does not require an arresting officer to resolve conflicting evidence in a manner favorable to a suspect; the concept of probable cause is a flexible and fluid one that looks to the totality of the

In short, Miami police officer Guzman's seizure of Scott was objectively reasonable. When considering the totality of the evidence, both inculpatory and exculpatory, there was probable cause to arrest Scott. And since there was probable cause to arrest Scott, the unreasonable seizure claims must fail as against Officer Guzman and the other arresting officers. The "fellow officer rule" under both federal and Florida law imputes "the collective knowledge of the investigating officers" "to each participating officer." *Terrell v. Smith*, 668 F.3d 1244, 1252 (11th Cir. 2012); *Voorhees v. State*, 699 So. 2d 602, 609 (Fla. 1997) (per curiam) ("The fellow officer rule allows an arresting officer to assume probable cause to arrest a suspect from information supplied by other officers."). Guzman informed the other officers that he had previously seen the speeding driver who crashed the Jeep Compass and fled on foot, and that the suspect was in fact Scott.

Having determined that the seizure was constitutional, as the Supreme Court has long held, the officers were permitted to search Scott incident to a lawful arrest. *See Harris v. United States*, 331 U.S. 145, 150 (1947) ("Search and seizure incident to lawful

---

available evidence; and these decisions are often made quickly by law enforcement officers based on what has just happened on the ground, and not later in the sterile confines of a courtroom or a law office. ("[T]he 'reasonable cause' necessary to support an arrest cannot demand the same strictness of proof as the accused's guilt upon a trial, unless the powers of peace officers are to be so cut down that they cannot possibly perform their duties." *Draper v. United States*, 358 U.S. 307, 312 n.4 (1959) (quoting *United States v. Heitner*, 149 F.2d 105, 106 (2d Cir. 1945) (Learned Hand, J.))).

arrest is a practice of ancient origin."); *Chimel v. California*, 395 U.S. 752, 763 (1969) ("There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control' -- construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."); *Arizona v. Gant*, 556 U.S. 332, 338 (2009) ("Among the exceptions to the warrant requirement is a search incident to a lawful arrest."); *Riley v. California*, 573 U.S. 373, 382–85 (2014) (reaffirming the continued vitality of the "search incident to arrest doctrine"). Moreover, Guzman had found an unregistered firearm, ammunition, and marijuana in the Jeep Compass along with Scott's identification card at the same time. This too heightened the need for the law enforcement officers to search Scott upon detaining him. *See, e.g.*, *New York v. Belton*, 453 U.S. 454, 462–63 (1981) (upholding the constitutionality of a search of the defendant's jacket after the police discovered marijuana in the car that the defendant was found in). Officer Hernandez did not violate the Fourth Amendment's prohibition on unreasonable searches by searching Scott's person incident to the lawful arrest.

Since the officers had probable cause to arrest and search Scott, the officers are entitled to qualified immunity.[4] *See*

---

[4] Scott separately argues that the doctrine of qualified immunity itself is unconstitutional, while acknowledging that it "is the law." But the Supreme Court has repeatedly blessed the doctrine, which has also been reaffirmed many times by this Court. *See, e.g.*, *Ziglar v. Abbasi*, 582 U.S. 120 (2017); *Pearson v. Callahan*, 555 U.S. 223 (2009); *Davis v. Waller*, 44 F.4th 1305 (11th Cir. 2022); *Lee*, 284 F.3d at 1188. Because qualified immunity is undisputably the law of

*Singletary*, 804 F.3d at 1180.  The district court did not err in granting summary judgment on this basis to each of the law enforcement officers sued individually on Scott's federal claims.

### B.

Moreover, the district court did not err in granting summary judgment for the law enforcement officers and for the City of Miami on Scott's state law claims.  For starters, "[q]ualified immunity is a defense to federal causes of action [but] does not protect officials from claims based upon state law."  *Andreu v. Sapp*, 919 F.2d 637, 640 (11th Cir. 1990).  Thus, a finding of qualified immunity alone cannot serve as the basis for summary judgment on Scott's state law claims.

Under Florida law, false arrest and imprisonment require a plaintiff to establish: "(1) an unlawful detention and [deprivation] of liberty against the plaintiff's will; (2) an unreasonable detention which is not warranted by the circumstances; and (3) an intentional detention."  *Manners v. Cannella*, 891 F.3d 959, 975 (11th Cir. 2018) (alteration in original).  A city may also be liable for false arrest and imprisonment based on the actions of its officers.  *See Maybin v. Thompson*, 514 So. 2d 1129, 1131 (Fla. Dist. Ct. App. 1987) (agreeing "that a city may be liable for intentional torts of a police officer committed during arrest and detention").  Notably, however, the first element of unlawful detention and deprivation "cannot be

---

the land, Scott's argument fails, notwithstanding his "good faith [effort] to change existing law."

found where there is probable cause for the arrest" because "[u]nder Florida law, probable cause is 'a complete bar to an action for false arrest.'" *Manners*, 891 F.3d at 975 (quoting *Bolanos v. Metro. Dade Cnty.*, 677 So. 2d 1005, 1005 (Fla. Dist. Ct. App. 1996) (per curiam)). As we have already explained, the officers had probable cause to arrest Scott. Thus, Scott's state law false arrest claim must fail against both the officers individually and the City of Miami.

The district court also held that "Scott's claim against the City of Miami fails" because "there is no evidence that the officers' actions were done with malice or bad faith." *See* Fla. Stat. § 768.28(9)(a) (providing sovereign immunity unless there is evidence that an "agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property"). Scott argues that the district court erred in granting summary judgment for the City on this basis because the City never moved for summary judgment based on sovereign immunity. Regardless of whether the City made this argument, the district court erred in dismissing Scott's claim against the City under Florida's sovereign immunity statute because that statute provides immunity from tort liability only to "[a]n officer, employee, or agent of the state or of any of its subdivisions." *Id.* Only individuals, not cities or municipalities, may receive immunity under the statute. *See Butler v. Gualtieri*, 41 F.4th 1329, 1335 (11th Cir. 2022) ("Florida's sovereign immunity law provides qualifying government *officials* with immunity . . . ." (emphasis added)). Thus, the district court erred in concluding that the City of Miami had immunity under this statute.

The error was harmless nevertheless because, as we've already said, there was an independent basis to grant summary judgment for the City, the very same reason for rejecting all of the claims leveled against the individual officers -- a finding of probable cause to effect the arrest. Inasmuch as the individual officers are not liable for false arrest and imprisonment, the City cannot be found liable either. *See Maybin*, 514 So. 2d at 1131 (predicating a city's liability on the intentional torts committed by its officers); *see also Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1088 n.21 (11th Cir. 2007) (holding that an appellate court may affirm a lower court's holding on any ground supported by the record). Indeed, Scott conceded at the summary judgment hearing in district court that a finding of actual probable cause would result in the failure of all of his claims, including his claim against the City of Miami.

Finally, Scott's malicious prosecution claim against Officers Guzman and Bloom in their individual capacities must fail too. Malicious prosecution, a common law tort claim in Florida, requires a plaintiff to show:

> (1) The commencement or continuance of an original criminal or civil judicial proceeding. (2) Its legal causation by the present defendant against plaintiff who was defendant in the original proceeding. (3) Its bona fide termination in favor of the present plaintiff. (4) The absence of probable cause for such proceeding. (5) The presence of malice therein. (6) Damage conforming to legal standards resulting to plaintiff. *If any one of these elements is lacking, the result is fatal to the action.*

*Burns v. GCC Beverages, Inc.*, 502 So. 2d 1217, 1218 (Fla. 1986) (emphasis added) (quoting *Buchanan v. Miami Herald Publ'g Co.*, 230 So. 2d 9, 11 n.3 (Fla. 1969)).  Because the officers established probable cause to arrest Scott, the fourth element of his malicious prosecution claim cannot be established.  Therefore, this claim too cannot survive summary judgment.  *See Alvarez-Mena v. Miami-Dade County*, 305 So. 3d 63, 68 (Fla. Dist. Ct. App. 2019) (noting that plaintiffs' "claims for malicious prosecution and false arrest live or die based on whether probable cause existed for their arrests").

Accordingly, we **AFFIRM** the entry of final summary judgment for the defendants on all of Scott's claims.

**AFFIRMED.**

23-11280                JORDAN, J., Concurring                1

JORDAN, Circuit Judge, Concurring:

In certain circumstances, an officer's mistaken identification of a person as the perpetrator of a crime does not vitiate probable cause for that person's arrest. *See, e.g., Hill v. California*, 401 U.S. 797, 802 (1971) (agreeing with the court below that "the police had probable cause to arrest Hill and that the arresting officers had a reasonable, good faith belief that the arrestee Miller was in fact Hill" as well as "the conclusion that '(w)hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest.'") (citation omitted). Nevertheless, "officers cannot unreasonably and knowingly disregard or ignore evidence or refuse to take an obvious investigative step that would readily establish that they lack probable cause to arrest a suspect." *Harris v. Hixon*, 102 F.4th 1120, 1129 (11th Cir. 2024).

Viewing the evidence in the light most favorable to Samuel Scott, the plaintiff, I would hold that the arrest here was supported only by arguable probable cause. And because arguable probable cause leads to qualified immunity, I concur in the judgment.

## I

As most writers know, the accuracy of a factual narrative often depends on the vantage point from which the story is told. In *Rashomon*, a famous 1950 Japanese film directed by the great Akira Kurosawa, a killing in a forest is described in contradictory ways by four witnesses with different perspectives and interests. The Rashomon Effect, named after the movie, describes the

"combination of a difference of perspective and equally plausible accounts, with the absence of evidence to elevate one above others, [and] the inability to disqualify any particular version of the truth, all surrounded by the social pressure for closure on the question." Robert Anderson, *The Rashomon Effect and Communication*, 41 Can. J. of Commc'n 249, 257 (2016).

Why, one might ask, does *Rashomon* matter in this case? And why cite it in a judicial opinion? Because "Kurosawa and the authors of Civil Rule 56 shared an insight: that different people sometimes see the same event differently, whether due to different vantage points or self-interest." *Greco v. Livingston Cnty.*, 774 F.3d 1061, 1062 (6th Cir. 2014).

The perspective that matters the most here is the one that favors Mr. Scott. Because he was the party who opposed summary judgment, we must view the record evidence in the light most favorable to him. *See Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014).

And that view of the record applies to the issue of whether Mr. Scott's arrest was supported by probable cause or arguable probable cause. *See, e.g., Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1258 (11th Cir. 2010) (probable cause); *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006) (arguable probable cause). After all, "[i]n a § 1983 action, the existence of probable cause is a question of fact." *Gregory v. City of Louisville*, 444 F.3d 725, 743 (6th Cir. 2006). *Accord United States v. Gaudin*, 515 U.S. 506, 521 (1995) ("The question of probable cause to conduct a search . . . is resolved by the judge when it arises in the context of a motion to suppress evidence

obtained in the search; but by the jury when it is one of the elements of the crime of depriving a person of constitutional rights under color of law[.]") (citations omitted).

## II

In my opinion, the majority does not view all of the record evidence in the light most favorable to Mr. Scott, so I take time to set out my understanding of the narrative with all conflicts resolved in his favor.[1]

## A

Mr. Scott is a 42-year-old Black man with a beard who stands 5'11". He picked up his children from school on the afternoon of June 1, 2018, and went to see a relative. He parked his car, a 2006 Jeep Compass, in front of his relative's house, located at 563 N.W. 48th Street in Miami. His work ID hung on a lanyard on the car's rearview mirror. He went inside his relative's house for about a few minutes, and when he came out his car was gone.

At about 5:40 pm, Mr. Scott called the police to report that his car had been stolen. *See* D.E. 69-2 at 2. At 6:22 p.m., the dispatcher issued a BOLO, informed City of Miami police officers that

---

[1] In its summary judgment order, the district court did not view the evidence in the light most favorable to Mr. Scott and took everything Officer Jonathan Guzman said as the gospel truth. For example, the order does not set out or credit Mr. Scott's denial that he falsely reported his Compass stolen and denial that he crashed the Compass and fled from Officer Guzman.

Mr. Scott's car had been stolen by an unknown person, and provided Mr. Scott's phone number and location.  *See* D.E. 69-10.

Officer Michael Bloom responded and called Mr. Scott at the number provided by the dispatcher.  Then, at approximately 6:30 p.m.—eight minutes after the dispatcher sent out the BOLO for the stolen Compass—Officer Bloom met Mr. Scott in front of his relative's house.  *See* D.E. 83 at 2.  Mr. Scott was wearing a black shirt and blue jeans, and did not change his clothes after Officer Bloom arrived.  It did not appear to Officer Bloom that Mr. Scott had been running, and he had minimal sweat on his forehead while outside during a summer day in Miami.  *See* D.E. 69-8 at 32.

As requested by Officer Bloom, Mr. Scott completed and executed a stolen vehicle affidavit.  Officer Bloom stayed with Mr. Scott until the arrival of other officers, as set out below.

**B**

On the evening of June 1, 2018, Officer Jonathan Guzman was in his police car on radar patrol duty.  He observed a 2006 Jeep Compass proceeding south on 12th Avenue and N.W. 67th Street while exceeding the 35-mph limit in the area.  The Compass was about 10 feet way when it passed Officer Guzman at 50 mph.  *See* D.E. 69-2 at 1; D.E. 69-3 at 47–50.  At his deposition, he could not recall the exact time that he first saw the Compass, and his car did not have a dash camera.  *See* D.E. 69-3 at 23–24, 26.  But the arrest report states that he first saw the Compass at 6:05 pm.  *See* D.E. 69-2 at 1.

Officer Guzman said he was able to get a good look at the driver of the Compass as it got close and drove by him. He described the driver as a heavyset, bald, Black male wearing a white tank top. *See* D.E. 69-3 at 25; D.E. 69-2 at 1. Officer Guzman, who did not turn on his body worn camera, never described the driver as having a beard. *See* D.E. 69-3 at 42.

Still in his police car, Officer Guzman made a U-turn and followed the Compass, which was about a half a block ahead of him. At some point he turned on his sirens. *See* D.E. 69-2; D.E. 69-3 at 25–26, 31, 82. The Compass, however, sped up and made two turns, eventually heading northbound on 10th Avenue. Then the Compass turned east on 71st Street and north on 5th Avenue. *See* D.E. 69-3 at 28–29, 31–32.

The Compass crashed into a parked car at 515 N.W. 72nd Street—a location which was one mile away from where Officer Guzman first saw the Compass driving by at 50 mph and two miles north of the house of Mr. Scott's relative. *See* D.E. 69-3 at 33–34. The driver of the Compass exited the car and fled on foot westbound and then northbound (i.e., in a direction away from the house of Mr. Scott's relative). Officer Guzman followed the driver for a few seconds and told him to stop, but the driver ran under the I-95 tunnel. *See* D.E. 69-3 at 166. At that point Officer Guzman lost sight of the driver, whom he had only seen from behind during the chase. *See* D.E 69-3 at 34–36, 166.

Officer Guzman returned to his police car and set up a half-mile perimeter with other officers from 5th Avenue to 7th Avenue

and from 71st Street to 75th Street.  *See* D.E. 69-3 at 38–40.  The perimeter was in place for about 15 minutes.  *See* D.E. 69-3 at 40.

At the crash scene, Officer Guzman told Officer Randy Carriel, one of the officers who had by then arrived, that the driver of the Compass was wearing shorts.  *See* D.E. 69-6 at 41.  Once the perimeter was shut down, Officer Guzman searched the Compass. He found some cannabis in the center console, a firearm on the floor, and Mr. Scott's work ID.  *See* D.E. 69-3 at 40, 43.

As he was conducting the search, Officer Guzman heard over the radio that the Compass had been reported stolen.  *See* D.E. 69-3 at 43.  As noted earlier, the dispatch with the BOLO was sent out at 6:22 pm.  *See* D.E. 69-10.  Officer Guzman told his sergeant that he was going to the scene of the of the car theft.  By then he had been at the crash scene for about 20-30 minutes.  *See* D.E. 69-3 at 44–45.

Before driving to the house of Mr. Scott's relative, Officer Guzman spoke to Officer Bloom.  He asked Officer Bloom for the description of the person who had reported his car stolen.  But he did not ask Officer Bloom how long he had been with that person.

## C

It took Officer Guzman about five minutes to drive to the house of Mr. Scott's relative.  *See* D.E. 69-3 at 45.  When he arrived, Officer Guzman met Officer Bloom, Officer Carriel, Officer Miguel Hernandez, and Mr. Scott.  *See* D.E. 69-3 at 45–46.  Officer Guzman testified at his deposition that he "immediately recognized" Mr. Scott as the driver of the Compass.  *See* D.E. 69-3 at 47.

Officer Guzman asked Officer Bloom if Mr. Scott had signed the stolen vehicle affidavit.  Officer Bloom said yes, and Officer Guzman reviewed the affidavit.  *See* D.E. 69-3 at 51–52.  Officer Carriel told Officer Bloom, "That's the bailout," even though he had never seen the driver of the Compass.  *See* Guzman Body Worn Camera 1 at 22:45:50Z–22:45:54Z.[2]

Officer Carriel grew impatient with Officer Guzman, telling him in Spanish that they were wasting time, and if Mr. Scott was the man he had seen, there was no need to wait.  *See* D.E. 69-6 at 174; D.E. 69-9 at 108, 110.  Officer Guzman again failed to ask Officer Bloom how long he had been with Mr. Scott.

Although Officer Guzman said he believed he had probable cause at this point to arrest Mr. Scott for falsifying the affidavit, he did not inform Officer Bloom of this belief.  *See* D.E. 69-3 at 52–54.  Officer Guzman spoke only to Officer Carriel, who as noted had been at the scene of the crash of the Compass.  *See* D.E. 69-3 at 54–55.  Officer Guzman called his sergeant and told him, "That's your boy."  Guzman Body Worn Camera 1 at 22:46:02Z–22:46:53Z.

At about this time, Officer Carriel told Officer Guzman in Spanish, "He has the white shirt underneath . . . With that no more."  Carriel Body Worn Camera at 22:47:50Z–22:47:59Z ("Papi tiene la camiseta blanca debajo . . . Con eso no más.  Eso no más.").

---

[2] The Z stands for Zulu time, which is four hours ahead of Eastern Standard Time from March to November.  *See* D.E. 57 at 5 n.4.  So in June, 22:46:02Z would be 6:46:02 pm EST.

Officer Carriel testified at his deposition that he was telling Officer Guzman that they had probable cause to arrest Mr. Scott because he had a white shirt underneath and they did not need anything else.  *See* D.E. 69-6 at 170.

Officer Guzman told his sergeant, "Yeah, that's him.  Sarge, he's sweating.  He has a black shirt on top of the tank top shirt that he had when he was driving . . . They didn't tell me they saw the guy.  The guy was on the phone.  The short guy was on the phone when I got here.  I don't know if he saw the guy or not but that's when I came back.  There was nobody outside when he crashed." Guzman Body Worn Camera 1 at 22:51:25Z–22:52:08Z.

Then Officer Guzman placed Mr. Scott in handcuffs.  *See* D.E. 69-3 at 56.  According to Officer Guzman, Mr. Scott "couldn't dispel [his] alarm of where he was before."  D.E. 69-3 at 58.

When Mr. Scott asked the reason for his arrest, Officer Guzman did not tell him that he had personally seen him drive and crash the stolen Compass.  Instead, he told Mr. Scott that the "description of the guy that took off and your car is just like yours." Guzman Body Worn Camera 2 at 22:59:56Z–23:00:00Z.

Mr. Scott told Officer Guzman that he had not been involved in any wrongdoing: "I'm telling you guys got the wrong guy. I can confirm where I was and I can confirm my activities.  I recently logged off the VPN at my job . . . Roughly before I came over here before I called you guys . . . I mean, why would I call the police?  I mean, I called because my car is stolen[.]"  Guzman Body Worn Camera 2 at 22:59:38Z–23:01:04Z.

### III

Mr. Scott denied having faked the theft of his Compass, and denied being the driver of the Compass which sped by Officer Guzman and ultimately crashed into another vehicle. *See Guzman Body Worn Camera 2* at 22:59:38Z–23:00:21Z. For summary judgment purposes, therefore, we must view as mistaken Officer Guzman's identification of Mr. Scott as the driver of the stolen Compass. The majority, however, only treats Officer Guzman's mistaken identification as an alternative scenario. *See* Maj. Op. at 14 ("Even if [Officer] Guzman had been mistaken in his eyewitness identification of [Mr. Scott] . . . ."). That seems incorrect to me. Viewing the summary judgment record in the light most favorable to Mr. Scott, the question is whether his arrest, was supported by probable cause, by arguable probable cause, or by neither.

### A

The "probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances," but the "substance of all the definitions of probable cause is a reasonable ground for belief of guilt," and "that the belief of guilt must be particularized with respect to the person to be searched or seized[.]" *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotation marks and citations omitted). *See also Hunter v. Bryant*, 502 U.S. 224, 228 (1991) ("Probable cause existed if at the moment the arrest was made . . . the facts and circumstances within their knowledge and of which they had reasonably trustworthy

information were sufficient to warrant a prudent man in believing that Bryant had violated 18 U.S.C. § 871.") (internal quotation marks and citation omitted).  We must consider the totality of the circumstances and cannot use a "divide and conquer" approach which isolates the relevant facts.  *See District of Columbia v. Wesby*, 583 U.S. 48, 60–62 (2018).[3]

Viewing the evidence collectively, and in the light most favorable to Mr. Scott, I do not believe we can conclude that Officer Guzman had probable cause for an arrest.

Officer Guzman said he saw the Compass speed by him at 6:05 pm.  The dispatch with the BOLO about the stolen Compass was broadcast at 6:22 pm.  By that time the Compass had already crashed into another vehicle at 5th Avenue and N.W. 72nd Street, and Officer Guzman had set up a perimeter and was searching the Compass.

Just eight minutes later, at 6:30 pm, Officer Bloom met Mr. Scott at his relative's house.  That house was two miles away from the crash scene, and it would have taken a normal person 30–40 minutes to walk from the latter to the former.  So Mr. Scott could

---

[3] A "reviewing court may examine the collective knowledge of . . . officers" where, as here, "they maintained at least a minimal level of communication during their investigation."  *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985).  Normally this principle works in favor of police officers, who each may just know a piece of the entire evidentiary puzzle.  But in a case like this one—where the collective knowledge casts some doubt on an individual officer's version of events—it can work in favor of the person who is challenging an arrest.

not have been the driver of the stolen Compass and met Officer Bloom at 6:30 pm at his relative's house.  No person on this earth can be in two places at the same time.

The majority suggests that that Mr. Scott could have somehow gotten from the crash scene to his relative's house in eight minutes in a car or another mode of wheeled transportation.  *See* Maj. Op. at 16 ("[I]t is altogether plausible to believe that [Mr.] Scott did not actually run on foot from the crash site to the scene of the purported car theft, but rather took another form of transportation—maybe a bicycle, an electric scooter, or another vehicle—to get there.").  If the majority were acting as the factfinder, that might be a permissible inference.  But a court is not permitted to "weigh the evidence" and act as the jury at the summary judgment stage, *see Tolan*, 572 U.S. at 656 (internal quotation marks and citation omitted), and there is nothing in the record to support (much less compel) that inference against Mr. Scott.  *See Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1328 (11th Cir. 2022) ("Even when the underlying facts are undisputed, summary judgment is improper if those facts can lead to conflicting inferences on material issues.").

I realize I must sound like a broken record, but we are supposed to view the facts in the light most favorable to Mr. Scott and draw reasonable inferences in his favor.  By speculating that Mr. Scott could have gotten in an unidentified car (or used a bicycle or scooter) after the crash to get to his relative's house by 6:30 pm, the majority draws inferences in favor of Officer Guzman and not Mr.

Scott. Moreover, to get to the majority's hypothetical factual scenario one would also have to speculate that Mr. Scott—after getting into another car (or bicycle or scooter) after the crash—spoke to Officer Bloom sometime between 6:22 pm and 6:30 pm and still got to his relative's house in enough time to meet Officer Bloom there at 6:30 pm. That is certainly not an inference compelled by the record.

    If we are going to draw inferences, there are reasons to doubt Officer Guzman's claim that he was able to confidently identify the driver of the Compass when he was on radar patrol. Officer Guzman said he was able to see the face of the driver of the Compass clearly even though the vehicle was coming towards him at 50 mph and would have whizzed right by. A jury could find that someone in Officer Guzman's position could not have definitively identified the driver of the Compass. Indeed, Officer Guzman never stated (neither in the arrest affidavit nor at his deposition) that the driver had a beard. Mr. Scott had a beard, and no one has suggested that he could have grown one in less than half an hour. If the driver did not have a beard, Officer Guzman could not have reasonably believed that Mr. Scott was the driver. Finally, Mr. Scott was not in the same clothes as the driver of the Compass. Mr. Scott was wearing a dark shirt and jeans; the driver was wearing a white shirt and shorts. A jury could conclude that the only reason Officer Guzman identified Mr. Scott as the driver was the fact that he had found Mr.

Scott's ID in the Compass—a fact that is also consistent with the car having been stolen from Mr. Scott.[4]

Moreover, although Officer Guzman said that he immediately recognized Mr. Scott as the driver of the Compass, his actions at the house tell a different story. Officer Guzman did not tell Officer Bloom of his suspicions about Mr. Scott. Nor did Officer Guzman ask Officer Bloom at what time he met Mr. Scott. Officer Carriel thought that Officer Guzman was hesitating and wasting time, and Officer Guzman made the arrest only after Officer Carriel urged him on. Officer Guzman's actions were not those of an officer confident of his identification.

**B**

The Supreme Court has explained that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). In qualified immunity parlance, this is known as arguable probable

---

[4] Officer Guzman's version of events is that Mr. Scott, the owner of the Compass, (1) falsely reported the car stolen, and then, despite knowing that the police would be looking for it, (2) decided to drive the car—containing cannabis and a gun—himself over the speed limit, (3) crashed into another vehicle, (4) spoke to Officer Bloom just after the crash, and (4) somehow got back to his relative's house in time to meet with Officer Bloom. That improbable version of events provides probable cause only if the facts and inferences are viewed in Officer Guzman's favor.

cause, and it exists where "reasonable officers in the same circumstances and possessing the same knowledge as the [defendant] could have believed that probable cause existed to arrest." *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018). *See, e.g., Wesby*, 583 U.S. at 65 ("Even assuming the officers lacked actual probable cause to arrest the partygoers, the officers are entitled to qualified immunity because they "reasonably but mistakenly conclude[d] that probable cause [was] present.") (internal quotation marks and citation omitted).

As I see this case in its summary judgment posture, it is one involving mistaken identification and lacking in probable cause. Nevertheless, in my view Officer Guzman had arguable probable cause to arrest Mr. Scott. Although his identification of Mr. Scott as the driver of the stolen Compass was mistaken, a reasonable officer in Officer Guzman's position could have reasonably believed that probable cause existed. Stated differently, Officer Guzman, though mistaken, could have reasonably concluded that Mr. Scott was the driver of the Compass. Both Mr. Scott and the driver were Black men who were bald, and the work ID found in the Compass could arguably point to Mr. Scott has having been the driver (though it could just as easily have pointed to the ID having been left by Mr. Scott in the car before it was stolen).

## IV

"The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter*, 502 U.S.

23-11280                JORDAN, J., Concurring                15

at 229 (internal quotation marks omitted).  I would grant Officer Guzman qualified immunity on the false arrest claim because he had arguable probable cause under controlling precedent to arrest Mr. Scott.[5]

---

[5] Because the majority's probable cause determination is case dispositive, I do not address any other issues.